UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael SCHMIDT,
Defendant–Appellant.

No. 90–1070.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 5, 1990.

Decided Jan. 30, 1991.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., Lorraine N. Mackler, Office of the Special Investigations, Susan L. Siegal, Ronnie L. Edelman, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

George B. Collins, Jody B. Rosenbaum, Collins & Bargione, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and PELL, Senior Circuit Judge.

BAUER, Chief Judge.

The constitution empowers Congress "[t]o establish an uniform Rule of Naturalization." Article I, sec. 8, cl. 4. Any alien who seeks to acquire the "precious right" of American citizenship must meet all the requirements fixed by Congress. *Schneiderman v. United States*, 320 U.S. 118, 122 & 131, 63 S.Ct. 1333, 1335 & 1339, 87 L.Ed. 1796 (1943). One of the requirements Congress established for citizenship is entry into the United States by means of a legally procured immigration visa. Section 13 of the Displaced Persons Act of 1948, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, *as amended by* Pub.L. No. 81–555, ch. 262, 64 Stat. 219 (1950), provides that any individual who advocated or assisted in the persecution of persons because of race, religion or national origin is ineligible to obtain a visa. In the judgment appealed from here, the district court revoked Michael Schmidt's citizenship and canceled his certificate of naturalization pursuant to 8 U.S.C. § 1451(a) of the Immigration and Nationality Act.[1] The district court found that because Schmidt served as an armed guard with the Nazi "Death's Head Battalion" at the Sachsenhausen concentration

---

1. 8 U.S.C. § 1451(a) provides in pertinent part: (a) It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization *were illegally procured* or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively.... (Emphasis provided.)

camp during World War II, he was ineligible to receive a visa. The court concluded that, because Schmidt's visa was invalid, he did not have lawful permission to enter the United States, and thus his subsequent naturalization was procured unlawfully under section 316(a)(1) of the Immigration and Nationality Act. 8 U.S.C. § 1427(a)(1) (1982).[2] For the following reasons, we affirm.

## I.

Michael Schmidt was born in Scharosch, Romania, of German parentage. In June, 1943, he was inducted into the German Army as a private and assigned to serve at the Sachsenhausen concentration camp near Oraneinburg, Germany. In the district court, the Government presented extensive evidence concerning the history of the Nazi regime and its plan to exterminate systematically individuals who disagreed with its policies, as well as groups it considered to be racially and socially inferior. The Nazis used concentration camps to carry out the Third Reich's plan to exterminate enemies or to exploit them through forced labor. The Gestapo, the Nazi secret police force, arrested and detained all persons thought to be enemies of the state. Those held in this manner could be incarcerated without trial for indefinite periods of time.

During Schmidt's service at Sachsenhausen, the camp was the second largest Nazi concentration camp after Auschwitz. Among those incarcerated there were Jews, Gypsies, Jehovah's Witnesses, certain Eastern European ethnics, political dissidents, homosexuals, and various individuals considered social "misfits," including beggars, vagrants, and the mentally ill. Each category of prisoner was forced to wear a colored triangle on the outside of its uniform: Jews, yellow; political prisoners, red; social misfits, black/brown; Jehovah's Witnesses, violet; homosexuals, pink. At the height of its operation, Sachsenhausen contained approximately 50,000 prisoners.

The "Death Head's Battalion"—the SS–Totenkopf Sturmbann—was organized as part of the armed SS[3] for the purpose of guarding Nazi concentration camps. The military command assigned Schmidt to guard prisoners on forced labor crews outside Sachsenhausen. His duties included escorting prisoners to and from work sites, counting prisoners before returning them to the concentration camp, and keeping prisoners in formation. Schmidt wore on his SS uniform the skull and crossbones insignia of the Death Head's Battalion. He carried a rifle and ammunition and had orders to shoot at prisoners who attempted to escape. Because concentration camp guards were not permitted to enter the camps themselves, Schmidt was confined to patrol outside the camp wall. Although there is no evidence that Schmidt personally killed prisoners, it has been documented that during the period he served at Sachsenhausen, two Jews were intentionally murdered and at least thirteen prisoners were executed by being shot through the nape of the neck.

In addition, tens of thousands died in Sachsenhausen as a result of starvation, exhaustion, beatings, exposure, disease, and medical experimentation. The grim history of Sachsenhausen has been well-documented by historians and tribunals that have tried Nazi war criminals. For example, the Government presented transcripts of German criminal proceedings against various individuals found guilty of committing atrocities at Sachsenhausen: camp leaders Hermann Sorge and August Hohn; barracks leader Wilhelm Karl Ferdinand; and medical doctors Heinz Baumkotter, Alois Gaberle, and Otto Adam. In addition, the Government presented the testimony of a historian, Charles W. Syndor, President of Emory and Henry College in Emory, Virginia, who has made a career of studying the Nazi regime and its concentration camps. Syndor's testimony catalogued the mass killings, subhuman living conditions, and bizarre medical experiments

---

**2.** Section 316(a)(1) states in part that lawful admission to the United States is a prerequisite to naturalization.

**3.** *Die Schutzstaffel* ("SS") was the elite guard and intelligence unit of the Nazi Party.

that occurred in Sachsenhausen and its environs. Finally, the Government submitted transcribed interrogations of Sachsenhausen guards and the testimony of camp survivors who witnessed beatings, killings, and indescribably cruel treatment of prisoners.

Schmidt continued to serve as an armed guard at Sachsenhausen until at least September, 1944. He then served in the Third Battalion of the 38th SS Armored Infantry Division, "Goetz von Berlichingen," and was wounded in combat in Lorraine, France on November 28, 1944. He remained in military hospitals until he became a British prisoner of war. He was released on July 8, 1946.

Schmidt made his way to the United States under the authority of the Displaced Persons Act of 1948 ("DPA").[4] Congress enacted the DPA to accommodate the large number of European refugees wishing to emigrate to the United States after World War II. A person seeking to obtain an immigration visa under the DPA was required to obtain a designation of "displaced person" status as defined by the Constitution of the International Refugee Organization of the United Nations ("IRO"). 62 Stat. 3037–55 (1946).[5] Annex I, Part II of the IRO Constitution provided that war criminals and others who "assisted the enemy in persecuting [6] civil populations of countries" were not "the concern" of the IRO. *Id.* at 3051–52. These individuals thus were excluded from the definition of "displaced persons" under the DPA.

After checking the applicant's background, a case analyst from the Displaced Persons Commission ("DPC") issued a report certifying that the applicant was a person eligible for admission into the United States. The analyst then forwarded the applicant's file to the appropriate American consulate. A vice-consul reviewed the visa application and other documents in the applicant's file, including the preliminary IRO certification and the DPC report. The vice-consul also interviewed the applicant and, if the applicant met the criteria of the DPA and other immigration laws, the vice-consul issued a visa.

After living in Germany and Austria for several years following the war, Schmidt applied for a determination from the DPC that he was a displaced person eligible to emigrate to the United States. On his application, Schmidt indicated to the DPC that he was conscripted into the "German Army, Waffen–SS 'Goetz von Berlichingen,'" but he did not indicate his service as a guard at Sachsenhausen. Based on Schmidt's representations in his questionnaire, on February 28, 1952, DPC case analyst John F. Zipf, Jr. certified Schmidt as a displaced person eligible for a visa. Paul B. Lanius, Jr., the American Vice–Consul in Salzburg, Austria, issued Schmidt a visa in April, 1952. Schmidt entered the United States pursuant to this visa on May 24, 1952.

On March 1, 1968, Schmidt filed an application to become a United States citizen. Question 7 of the application form required him to list "present and past membership in every organization, association, fund, foundation, party, club, society, or similar group in the United States and in any other place, and your foreign military service." Schmidt entered his military service in the German army from 1943 to 1945, but did not indicate that he had served as an armed guard at Sachsenhausen from June, 1943 to September, 1944. On April 2, 1968, the United States District Court for the Northern District of Illinois issued a certificate

---

**4.** The amended version of the Act applied to individuals who, like Schmidt, entered the United States after its enactment.

**5.** The IRO was founded in 1946 to provide services to the thousands of former prisoners of war and others dislocated by the war.

**6.** As we indicated in *Schellong v. INS,* 805 F.2d 655, 660 (7th Cir.1986), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987), a

"substantial body of precedent" informs the definition of "persecution." The general standard is "the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.,* race, religion, political opinion, etc.), in a manner condemned by civilized governments." *Id.* at 662 (citing H.R.Rep. No. 95–1452, 95th Cong., 2d Sess. at 5 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 4700, at 4704).

of naturalization granting Schmidt United States citizenship.

Schmidt lived a quiet life in the Chicago area, where he worked as a janitor until his retirement. Following a determination by the Criminal Division of the Office of Special Investigations of the United States Department of Justice that there was good cause to revoke Schmidt's citizenship, the Government filed a complaint in federal district court on November 2, 1988. The court ordered Schmidt's citizenship revoked[7] and, in February, 1990, Schmidt surrendered his certificate of naturalization to the Attorney General of the United States. This appeal followed.

## II.

At issue is whether, under section 13 of the Displaced Persons Act, Schmidt's service in the SS as a guard at Sachsenhausen concentration camp rendered him ineligible to obtain a visa, in that his activities constituted assistance in the persecution of persons because of race, religion or national origin. The district court believed it did, and granted summary judgment on that basis. Summary judgment is appropriate in denaturalization proceedings when there are no genuine issues of triable fact. *United States v. Dercacz*, 530 F.Supp. 1348, 1350–51 (E.D.N.Y.1982). We review the matter *de novo* to determine whether the record as a whole establishes that the Government was entitled to judgment as a matter of law.

■ Citizenship is procured illegally any time the applicant has failed to comply with "all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686

(1981) (citing *Afroyim v. Rusk*, 387 U.S. 253, 267 n. 23, 87 S.Ct. 1660, 1667 n. 23, 18 L.Ed.2d 757 (1967)). Section 316(a)(1) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1427, requires that the person seeking naturalization has been "lawfully admitted for permanent residence," that is, possess a valid visa. In denaturalization proceedings for illegal acquisition of citizenship, an individual's failure to enter the United States lawfully by means of a valid immigration visa, a condition precedent to naturalization, commands denaturalization. Further, section 13 of the DPA mandates that an individual is ineligible for a visa if a member of a specifically excluded category of persons: those who assisted in persecution. *See, e.g., United States v. Leprich*, 666 F.Supp. 967, 969 (E.D.Mich.1987) ("[B]ecause Leprich was a concentration camp guard, he was ineligible for the visa he received and his citizenship was illegally procured.")

The district court granted summary judgment in favor of the Government on the ground that Schmidt had "in fact assisted in the persecution of persons because of their race, religion or national origin by serving as an armed guard at Sachsenhausen concentration camp." *United States v. Schmidt*, No. 88–C–9475, slip op. at 21, 1990 WL 6667 (N.D.Ill. January 3, 1990). Schmidt argues that the district court erred in several respects. The essence of his argument is that the court improperly focused upon his *status* as a member of the "Death Head's Battalion," rather than upon his *specific* conduct.

■ Schmidt first maintains that the court failed to consider that he involuntarily joined the SS. In *Fedorenko*, the Supreme Court stated that "[u]nder traditional principles of statutory construction, the

---

7. The district court entered summary judgment on Count I of the complaint, which alleged that Schmidt was not eligible for a visa under section 13 of the DPA because of his service as an armed guard at a concentration camp. Accordingly, the district court did not reach issues presented by the other counts of the complaint: whether Schmidt was a member of a movement hostile to the United States or to the form of government of the United States (Count II), whether he voluntarily bore arms against the United States (Count III), whether he acquiesced in activities or conduct contrary to civilization and decency on behalf of the Axis countries (Count IV), whether he willfully made misrepresentations in his visa application (Count V), whether he possessed the requisite good moral character to obtain a visa (Counts VI and VII), and whether he willfully concealed his membership in organizations on his naturalization petition (Count VIII).

deliberate omission of the word 'voluntary' from the DPA compels the conclusion that the statute made *all* who assisted in the persecution of civilians ineligible for visas." 449 U.S. at 512, 101 S.Ct. at 750 (emphasis in original). The Court rejected the distinction between voluntary and involuntary service for DPA purposes, and held that service as an armed guard in a concentration camp constitutes assistance to the enemy under the DPA as a matter of law. *Id.* at 514, 101 S.Ct. at 751. Therefore, Schmidt's involuntary service argument is meritless.

Schmidt also argues that he personally did not commit atrocities against the Sachsenhausen prisoners. He contends that because armed guards were not permitted to enter the camp, he had no knowledge of the persecution occurring within Sachsenhausen's walls. Whether or not Schmidt personally engaged in acts of violence, however, does not affect our conclusion that he assisted in persecution.[8] Concerned that concentration camp survivors might become ineligible for visas because of "assistance" they had provided to their Nazi captors in the death camps, the *Fedorenko* Court drew a continuum of conduct ranging from passive acceptance to active, personal participation. The Court distinguished between a person who only cut the hair of fellow inmates before they were killed and an armed guard who shot a fleeing inmate, finding that the former should not be found to have assisted in the persecution of civilians, but that the latter should. *Id.* at 512 n. 34, 101 S.Ct. at 750 n. 34. It is more difficult to determine whether conduct falling elsewhere on the continuum may be considered persecution. The difficulty of the problem is magnified by the task of determining the contribution of a single individual to the collective wrongdoing of a nation or group.

Whatever close questions may be presented by the application of the *Fedorenko* continuum to other factual situations, it is clear that service as an armed concentration camp guard constitutes assisting in persecution under the DPA. In *Schellong v. INS,* 805 F.2d 655 (7th Cir.1986), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987), we observed that "Nazi concentration camps were places of persecution; individuals who, armed with guns, held the prisoners captive and prodded them into forced labor with threats of death or capital punishment cannot deny that they aided the Nazis in their program of racial, political, and religious oppression." *Id.* at 661. When examined in context, the activities of an armed concentration guard must be viewed as contributing to the collective effort of the Nazis to persecute innocent civilians.

Indeed, the facts in Schmidt's case virtually are indistinguishable from those in *Kulle v. INS,* 825 F.2d 1188 (7th Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988). Kulle also served in the Totenkopf Division of the Nazi Waffen SS. From 1942 to 1945, he was an armed guard at Gross–Rosen, a concentration camp in Silesia, now a part of Poland. Gross–Rosen was a forced labor camp, and Kulle, like Schmidt, worked along the perimeter of the camp. Kulle, like Schmidt, argued that he did not assist in persecuting prisoners "merely because he was present." *Id.* at 1192. Rejecting this argument, we indicated that, because the applicable statutory provision authorized deportation of anyone who "assisted" in persecution, "personal involvement in atrocities need not be proven." *Id.* Thus, we affirmed an order of Board of Immigration Appeals that Kulle be deported because he participated in persecution. Schmidt argues that *Kulle* is distinguishable because Kulle participated in the forced removal of concentration camp prisoners from Poland

---

**8.** We note that although Schmidt's actual knowledge of the events occurring inside the walls of Sachsenhausen is unnecessary to a conclusion that he assisted in persecuting its inhabitants, his assertion that he was ignorant of the persecution is belied by the fact that he guarded concentration camp prisoners who wore color-coded patches to signify their racial, ethnic, social or political status. Further, Schmidt's primary job was to escort prisoners to and from forced labor sites. Some collapsed at work, and many later died from the combined effects of starvation and exhaustion.

to Germany in mid-winter, while Schmidt guarded work parties. The distinction eludes us. Service as an armed guard equally ensured the systematic destruction of concentration camp inmates. *See also United States v. Kairys*, 782 F.2d 1374, 1378 (7th Cir.1986) ("*Fedorenko* continues to stand for the proposition that service as an armed guard equals persecution.")

Thus, even if Schmidt personally did not participate in the brutal acts committed at Sachsenhausen, the fact of his armed, uniformed service is sufficient to establish that he assisted in persecution.[9] In *United States v. Osidach*, 513 F.Supp. 51, 78–79 (E.D.Pa.1981), *appeal dismissed on defendant's death*, No. 81–1956 (3rd Cir.1981), the court concluded that an individual who served as an armed, uniformed member of the Ukrainian police during World War II was a participant in persecution for purposes of section 13 of the DPA. The *Osidach* court suggests, as does Schmidt, that mere membership in a group involved in persecution is insufficient to establish that an individual is a persecutor himself. *Id.* at 79. Even the *Osidach* court recognized, however, that armed, uniformed service on behalf of an occupying force constitutes a form of persecution:

> The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities, physical abuse, injuries or even death, without notice or reason, is the personification of mental persecution, to anyone, let alone innocent civilian men, women and children reduced to various degrees of substandard mental and physical well-being.

*Id.* at 99.

In light of these precedents, we conclude that Schmidt assisted in persecution of persons because of race, religion or national origin as contemplated by section 13 of the DPA. He carried a gun and wore the uniform of the dreaded "Death Head's Battalion". He guarded Jews, Gypsies, Jehovah's Witnesses, Eastern European nationals, and other persecuted peoples and forced them to do the bidding of the Third Reich. Schmidt prevented these prisoners from fleeing, and subjected them to forced labor under unspeakably brutal conditions. Such employment removed Schmidt from the intended scope of those to be aided by the DPA.

### III.

In affirming the district court's revocation of Schmidt's citizenship, we are mindful of the fact that Schmidt has lived in the United States for many years, and that he has raised a family and established roots in this country. At the same time, we are mindful of the fact that Schmidt entered the United States on an invalid visa and acquired that "precious right" of citizenship unlawfully. When Congress enacted the DPA, it sought to help those who had been persecuted by the enemy because of their religious, nationalistic, and ethnic identities. By excluding those who "assisted in persecution" in section 13 of the DPA, Congress intended to prevent those who contributed to the Nazi persecution of innocent civilians from obtaining visas to enter the United States as refugees. It would defeat the paramount purpose of the DPA—to assist those whose lives had been disrupted by persecution—to extend the statute's benefits to the persecutors themselves.

As we held in *Kulle* and the Supreme Court held in *Fedorenko*, an armed guard

---

**9.** Schmidt argues that summary judgment was inappropriate because intent to persecute was at issue. This argument misses the mark entirely, as, in cases of this type, intent is irrelevant. In *Dercacz*, 530 F.Supp. at 1351, the trial court granted summary judgment to the Government in a denaturalization proceeding involving a former Ukrainian police officer whose duties included bringing Jews to the local police station and reporting civilians who had sold food to Jews. The Nazis used the Ukrainian police to keep order in occupied territories. The court held that clear and convincing evidence of Dercacz's service in the Ukrainian police force left "no doubt" that he assisted the Nazis in persecuting Jews. Here, the uncontroverted fact of Schmidt's service as an armed guard at Sachsenhausen is clear and convincing evidence that he assisted the Nazis in persecuting civilians.

at a Nazi concentration camp is not eligible for a visa under the Displaced Persons Act. Schmidt, therefore, was not eligible for the visa he obtained pursuant to the DPA. Because he did not fulfill all of the statutory requirements for naturalization, his citizenship was illegally procured. Accordingly, the district court's entry of summary judgment revoking his citizenship and canceling his certificate of naturalization was correct as a matter of law and is, therefore,

AFFIRMED.

PELL, Senior Circuit Judge, dissenting.

This case involves the cancellation of what the majority correctly terms the "precious right" of citizenship. Because I do not believe the resolution of that issue in this case by summary judgment was appropriate, I respectfully dissent.

There is substantial reference in the record of this case to the depths of depravity to which the Third Reich descended. No one disputes that now. The question before this court, however, in a sense, is the extent, if any, that Schmidt was smeared by the evil brush of the governmental activities inside Sachsenhausen.

The record is, of course, sparse because this case is here without a trial. But there is no evidence that this defendant participated in any wrongful act toward any prisoner; there is affirmative evidence that he was never inside Sachsenhausen prison camp; there is affirmative evidence that he was a work-party guard and that he obeyed the regulation which forbade mistreatment of prisoners on work parties; and there is affirmative evidence that his service to the Third Reich of Germany, not his native country, in World War II was hardly "voluntary." It was, accepting all of this, the district court's judgment that a violation was shown solely on the basis of participation as a guard outside the walls of the camp.

It may well be that summary judgment can be appropriate in a denaturalization case involving a claimed defective entry visa under the Displaced Persons Act. The majority opinion so states when there are no genuine issues of triable fact, citing *United States v. Dercacz*, 530 F.Supp. 1348, 1350–51 (E.D.N.Y.1982). In that case, however, Dercacz testified himself to the effect that he had assisted in persecution.

In the case before us, the only straw that would appear to seem to suggest Schmidt had some idea that some of the work prisoners were persecuted because of beliefs would be found in that he knew from their triangles that they were homosexuals. But, as his counsel pointed out, homosexuals were jailed in some of the states of this country at that very period of time.

The district court in its ruling found it did not make any difference whether Schmidt had knowledge or not. I disagree. As a matter of what was involved in the Displaced Persons Act, I cannot conceive how a person can be rendering assistance in persecution without some showable knowledge, or at the very least evidence of facts known to him which could lead only to a conclusion that the work prisoners were being persecuted. Schmidt, in my opinion, as a citizen was entitled to a trial on the issue of knowledge.

Cases interpreting *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), hold (while finding) that "in order to establish 'participation' or 'assistance' the act of participation must involve some personal activity involving persecution." *United States v. Osidach*, 513 F.Supp. 51, 72 (E.D.Pa.1981). The Ninth Circuit reads "assist" in these words:

"personal active assistance or participation in persecutorial acts...." (*Laipenieks v. INS*, 750 F.2d 1427, 1432 (9th Cir.1985).

*Fedorenko* does not hold otherwise; in both examples given (the barber and the guard who shoots) knowledge is presumed, unlike the present case in which there is no factual basis supporting knowledge. The court's holding was based simply on the fact that the haircutting did not rise to the level of "assistance in persecution." *Fedorenko* is not a case holding that "knowledge" is not an element of "assistance." *Fedorenko v. United States*, 449 U.S. at

512, note 34, 101 S.Ct. at 750, note 34; *Kungys v. United States,* 485 U.S. 759, 767, 108 S.Ct. 1537, 1544, 99 L.Ed.2d 839 (1988).

It is true that this concept of "assistance" is not "capable of a precise definition" (*United States v. Sprogis,* 763 F.2d 115, 121 (2d Cir.1985)), but it is also true that the "facts and the law should be construed as far as is reasonably possible in favor of the citizen...." *Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943).

The Government relied on *Kulle v. INS,* 825 F.2d 1188 (7th Cir.1987) as holding that there is no requirement of "knowledge" for "assisting."

Sergeant Kulle was deported on a record that included this question and answer (825 F.2d at 1195):

Q. Okay, was it your understanding at the time you made these lies, that if you had told the truth about your SS service you would have been denied admission to the United States?

A. That's correct.

Kulle had denied SS service. Schmidt put it on his application. Kulle was decorated with the Iron Cross (825 F.2d at 1190); Schmidt's service record shows nothing except that he came and went as a private, with no decorations. Kulle was a training leader, Schmidt was not. Kulle participated in a forced evacuation from a camp in the East to Mauthausen. Schmidt did not. The Court distinguished a "deportation" case from a denaturalization case (such as Schmidt's) (825 F.2d at 1193), and, with Kulle's admitted lies, ordered him deported.

As in *Schellong v. INS,* 805 F.2d 655 (7th Cir.1986), this court held that *Kulle* (on a trial record) had enough knowledge to be found to have assisted in persecution. In the present case, the facts in the record developed thus far did not reach the point of establishing knowledge on the part of Schmidt. In *Kulle,* a judgment was made on the basis of an INS record after a hearing at which Kulle's attorney was granted cross examination. Schmidt is to lose his citizenship without a fact hearing.

It may be at a trial, the trier of fact, evaluating the credibility of witnesses, might conclude that it is incredible that Schmidt during the relatively short period he was an outside guard could not help being aware that he was assisting in persecution. But that is a matter of credibility. Schmidt did not have such a chance. One might now think it is incredible that a presumably intelligent airline pilot could believe in good faith that the Internal Revenue Act is unconstitutional. *Cheek v. United States,* — U.S. —, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). He, however, was entitled to a fair trial and so should Schmidt be. Our system of justice that guilt should not be predicated on anything less than a fair trial is too important to tolerate any deviation or diminution.