UNITED STATES of America, Plaintiff,

v.

Ferenc KOREH, Defendant.

Civ. A. No. 89–2544 (MTB).

United States District Court,
D. New Jersey.

June 28, 1994.

Susan L. Siegal, Susan Masling, Senior Trial Attys., Michael D. Bergman, Trial Atty., Office of Special Investigations, U.S. Dept. of Justice, Washington, DC, James B. Clark, Asst. U.S. Atty., U.S. Attorney's Office, Newark, NJ, for plaintiff.

Judd Burstein, Kathryn McLaughlin, New York City, for defendant.

### OPINION

BARRY, District Judge

On September 15, 1950, defendant Ferenc Koreh executed an Application for Immigration Visa and Alien Registration and shortly thereafter was granted a visa by the American Consulate in Salzburg, Austria. He entered the United States on December 11, 1950 and on November 14, 1955 submitted an Application to File Petition for Naturalization and Statement of Facts in Preparation of Petition, with the executed Petition for Naturalization following on December 16, 1955. On March 8, 1956, defendant became a citizen of the United States when the United States District Court for the Eastern District of New York granted the Petition and issued him a Certificate of Naturalization.

The United States brings this action pursuant to Section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a) (the "Act"), to revoke defendant's citizenship.[1] The complaint is in ten counts and alleges that defendant was ineligible for citizenship in the United States because during World War II he was employed in Hungary as an officer of the Information Section of the Royal Hungarian Ministry of Defense and Propaganda; was Responsible Editor of and a writer for the anti-Semitic and anti-Allied privately owned daily newspaper *Szekely Nep;* was Responsible Editor of the anti-Allied government weekly newspaper, *Vilaglap;* and was a writer for the fascist Arrow Cross newspaper *Az Orszag.* The complaint also alleges that following World War II, defendant was convicted as a war criminal by virtue of his activities as Responsible Editor of *Vilaglap* and that he misrepresented and concealed his wartime activities to immigration and naturalization officials, thus illegally procuring his naturalization and rendering it invalid.

The United States now moves for summary judgment on five counts of the ten count complaint, any one of which would constitute a basis for exclusion under the Displaced Persons Act of 1948, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, *as amended* June 16, 1950, Pub.L. No. 81–55, ch. 262, 64 Stat. 219 (1950) ("DPA"), the law under which defendant received his visa and entered the United States. More specifically, the United States moves for summary judg-

---

1. Section 316(a)(1) of the Act provides that no person shall be naturalized unless he or she had been "lawfully admitted" to the United States. 8 U.S.C. § 1427(a)(1).

ment on Counts I and II of the complaint which allege that defendant's service as Responsible Editor of *Szekely Nep* from 1941 to 1942 constitutes assistance in persecution; on Count III of the complaint insofar as it addresses defendant's employment by the Axis government of Hungary as Press Information Officer and Deputy Section Chief of the Ministry of Propaganda from January 1943 until the German occupation of Hungary, his position as Responsible Editor of *Vilaglap* from May until November 1944, and his employment as Responsible Editor of *Szekely Nep* from 1941 to 1942, each of which is alleged to constitute membership and participation in a movement hostile to the United States; on Count IV of the complaint which alleges that defendant's service in the Ministry of Propaganda and at *Vilaglap* constitutes voluntary assistance to the enemy forces; and on Count X of the complaint by virtue of defendant's conviction by a postwar Hungarian court for his role at *Vilaglap*.

The United States has been conservative in the facts which it alleges in support of its motion for summary judgment, relying virtually exclusively on facts which have been stipulated, on defendant's statements and admissions, and on facts, including the historical background which places defendant's activities in perspective, which are not disputed. This court, based on those stipulated, admitted, and undisputed facts, and on those facts only, concludes that, as a matter of law, the United States' motion for summary judgment will be granted. Stated somewhat differently, the United States has shown by clear, unequivocal and convincing evidence that does not leave the issue in doubt that its motion for summary judgment should be granted. *Fedorenko v. United States*, 449 U.S. 490, 505–06, 101 S.Ct. 737, 746–47, 66 L.Ed.2d 686 (1981).

**2.** Defendant was born on September 4, 1909 in Sepsimagyaros, a region of Transylvania, then in Romania and re-annexed to Hungary in September, 1940.

**3.** This court rejects defendant's contention that this action is barred by the defense of laches because, while the complaint was not filed until 1989, the government was investigating this case as early as 1982. A laches defense cannot be

 Parenthetically, before reaching this point the court has had to resolve certain difficulties in its own mind and thus has dragged its judicial feet in hopes that the case would be disposed of in ways other than this. On the one hand, the court is faced with a defendant who will be 85 years of age in September, 1994[2] and who has been in this country for 44 of those years working until his retirement and apparently with some distinction for Radio Free Europe; producing and broadcasting a Hungarian language radio program; and writing for and/or editing a Hungarian newspaper, a Hungarian magazine, and a Hungarian news quarterly. Importantly, there is no suggestion that defendant personally committed or supervised the commission of any of the atrocities that one typically sees in cases in which the United States seeks denaturalization; indeed, had the conduct in which he concededly engaged and the anti-Semitic and anti-Allied articles he is alleged to have written and admittedly published occurred in this county, that conduct and those articles would most likely be protected by the First Amendment. On the other hand, defendant's admitted and undisputed activities during the discrete periods of time to which the United States points on this motion warrant denaturalization as a matter of law.[3] This court is bound to apply the law and will do so for the reasons which follow.

## I. *Background*

Between World War I and World War II, Hungary sought to regain the territories it lost to its neighbors under the provisions of the post-World War I Treaty of Trianon, signed in 1920. Hungary was successful in this regard principally because of its assistance to and relationship with Germany. Indeed, its alliance with Germany was evident in its decision to become the first East Central European government to adhere to the

relied on in a denaturalization proceeding, *see Fedorenko v. United States*, 449 U.S. 490, 517, 101 S.Ct. 737, 752, 66 L.Ed.2d 686 (1981), and defendant concedes that no court has found laches available in denaturalization cases. Def.Br. at 21. Even if laches were available, however, defendant has not articulated any specific prejudice as a result of the purported delay.

Tripartite Pact, by which Hungary formally joined the Axis on November 20, 1940. Hungary thereafter joined the Axis powers in their invasion of the Soviet Union on June 27, 1941. On December 13, 1941, Hungary joined the Axis declaration of war on the United States.

The German influence played a significant role in Hungary's domestic policies. In May 1938, on the heels of Germany's annexation of Austria which resulted in a common border between Hungary and Germany, the Hungarian Parliament passed the first of several anti-Semitic laws. This legislation limited to twenty percent the proportion of Jews that could be employed in the free professions (law, journalism, theater, music and the arts), and in financial, commercial and industrial enterprises with more than ten employees. Subsequent legislation defined "Jewishness" as a racial term, implemented stricter social and economic restrictions on Jews, and, among other things, prohibited Jews from obtaining Hungarian citizenship, from serving in public administration, and from holding leading positions in the press.

The Hungarian government's hostility toward Jews went beyond social and economic restrictions in early 1941. In April of that year, the Hungarian Government directed that all Jewish males serve in a Forced Labor Service which would be an auxiliary to the Hungarian Army. Many Jews who served in these labor camps died as a result of mistreatment, exposure, starvation, lack of medical care and, pure and simple, murder. In August 1941, following Hungary's participation in the invasion of Yugoslavia and the Soviet Union, Hungary passed a law criminalizing sexual relations between Jews and non-Jews and banning marriages between these two groups. Also in 1941, the first mass deportation of Jews from Hungary occurred after a government decree ordered the deportation from Hungarian territory of all Jews who could not prove that they held Hungarian citizenship. In August 1941 alone, approximately 18,000 Jews were deported to the German-occupied Ukraine where they were murdered and buried in mass graves by the SS and police units.

As early as 1938, the Hungarian government began to control the press for the purpose of influencing public opinion and bringing the press into line with the aims of the government, and the press corps was purged of Jews. Randolph Braham, an expert on the domestic and foreign relations of World War II Hungary, contends that the acceptance by Hungarian citizens of measures against fellow Hungarians such as the measures described above was attributable in part to the anti-Jewish political climate fostered by official propaganda and a fascist-oriented press which, in mid–1941, began to identify the Hungarian Jewish population as a threat. Defendant does not take issue with this contention. Neither does he dispute that during his admitted presence in 1941 and almost half of 1942 as Responsible Editor of *Szekely Nep*,[4] a daily paper published in Northern Transylvania where approximately 164,000 Jews lived under the anti-Semitic laws referred to above and from 1942 on the largest provincial paper in Hungary, the paper "ranked among the pro-Axis rightist press organs in the country", Braham Aff. ¶ 27. Nor does he dispute that the paper's anti-Jewish stance became virulent immediately after the entry of Hungary into the war against the Soviet Union on June 27, 1941 and that many specific articles displayed a racist sentiment against Jews by advocating economic and social discrimination against them, sentiments that were subsequently enacted into law by the Hungarian government. And, of course, nothing has been offered by defendant to rebut Braham's conclusion that because of the anti-Allied and anti-Semitic

---

4. Defendant held the position of Responsible Editor of *Szekely Nep* from January 18, 1941 until November, 1944. He contends, however, that although he was listed on the masthead as Responsible Editor during that period of time, he was not involved with the paper while he was in military training in Sepsiszentgyorgy, Marhsvasarhely, Szovata and other Transylvania localities from April 20 through July 1942, and from August 30th through October 23, 1942, and did not return to the paper after October 28, 1942. The United States does not press on this motion those periods of time during which defendant contends he was absent nor does it press any articles signed and purportedly written by defendant during periods of time he was admittedly present but which he challenges as not being his.

articles published in this and other papers, the resolve of the Hungarian people to continue the war on the side of the Axis powers was strengthened and they were conditioned to accept Hungary's swift and efficient persecution of Jews.

By January of 1943, defendant had moved to Budapest and taken a position in the Information Section of the Hungarian Ministry of Propaganda. The Ministry of Propaganda was created in 1942 by the government of Hungary to organize war propaganda, to disseminate the government's policy to Hungarians, and to collect information on public opinion. The Information Section of the Ministry was responsible for following public opinion and providing information to certain institutions and organizations in an effort to advance the dissemination of that information to the general public.

Defendant's responsibilities at the Ministry included the preparation of radio broadcasts, the monitoring of the Hungarian press, and occasional travel with his superior, Istvan Antal, when Antal gave public speeches. In the Spring of 1943 until March 1944, defendant also served as Responsible Editor of *Magyar Ero* (Hungarian power), a weekly paper which focused primarily on military matters and which was owned by the Ministry of Propaganda.

German forces occupied Hungary on March 19, 1944, and more than one hundred decrees related to Jews subsequently were issued including decrees identifying Jews and their property, which was confiscated; isolating Jews from Christians; forcing Jews to wear the yellow star of David and ordering them to move into ghettos; restricting their movements and their use of public transportation, baths, theaters, restaurants and their allocation of food; and culminating in mass deportations beginning on May 15, 1944 to such places as the Auschwitz death camp. The speed and magnitude of the deportations are evidenced by the fact that between the middle of May, 1944 and July 8, 1944, approximately 435,000 Hungarian Jews were transported out of Hungary to German labor and concentration camps, primarily Auschwitz.

From May 1944 to November 15, 1944, defendant was the Responsible Editor of *Vilaglap* ("World Journal"), a periodical owned by the Hungarian Government, having taken this position at the request of a government official at the Ministry of Culture. His responsibilities at *Vilaglap* included the supervision of the editorial staff and the review of photos and articles selected for publication. Although defendant does not concede that anti-Allied and pro-Nazi articles were published in *Vilaglap,* he admits that if any such articles were published, it was done at the direction of one of the ministries.

Under defendant as Responsible Editor, the profile and tone and the editorial board of the periodical changed, and the previous Responsible Editor, Zsigmond Havas, who was married to a Jew, was removed from his position. Braham opines that defendant's ascension to the position of Responsible Editor indicates that he was considered to be politically reliable by the post-occupation German government, and defendant offers nothing to refute that contention.

Braham is also of the opinion that shortly after defendant assumed control, the periodical dedicated a greater amount of space to war news. Furthermore, despite the realities of a failing German military during the summer of 1944, *Vilaglap* admittedly printed articles describing German military successes and encouraging the Hungarian citizenry to take an active part on the side of the German war effort and the Nazi cause. The periodical also used photographs to give a misleading, pro-German description of the war's progress. For example, in late June 1944, in connection with a discussion of the Allied landing at Normandy, eight photographs were published with captions depicting how the German army was successful in deterring the enemy. The articles Braham discusses, which were published while defendant was concededly the Responsible Editor, are classic examples of pro-German propaganda, exhorting the Hungarian people to continue supporting the German military effort despite the reality of its impending demise and expressly encouraging the defeat of the Allies.

In 1947, after a trial, defendant was convicted of a war crime by the People's Court of Hungary based on his role as Responsible Editor of *Vilaglap*,[5] the court finding that he determined the nature of the "political supervision" of the periodical. Defendant served seven months of his one year term of imprisonment, now contending that his trial was before a "kangaroo court" dominated by Communists and that he was denied most of the procedural protections a defendant enjoys in this country.

## II. *United States' Motion for Summary Judgment*

■ This court has already noted the plethora of defendant's admissions—in his depositions, his answer to the Amended Complaint, his testimony at the war crimes trial, and his answers to interrogatories—as well as the stipulated and undisputed facts that are before it in support of the United States' motion. Defendant "cannot survive summary judgment simply by presenting conclusory allegations or denials; the existence of specific material evidentiary facts must be shown" which contradict the facts averred by the United States. *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir. 1990), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). As relevant to this court's decision, defendant has not pointed to one "specific material evidentiary fact[ ]" in dispute. Indeed, aside from defendant's request that the affidavits of the "experts" for the United States not be used to establish facts that conflict with the stipulated facts and defendant's statement of the facts, a request which will be granted to the extent that his statement of the facts is more than mere conclusion or denial, defendant argues only that "only a full-blown trial" will leave the issue free from doubt and that, because of the lapse of time, he stands virtually alone in his defense and his credibility will, therefore, be key. (Def.Br. 15–16). Only a brief response is called for: where there are no disputed facts and where an issue can and should be decided as a matter of law, a trial is both unnecessary and inappropriate and credibility is irrelevant.

As also already noted, any one of the proffered bases for this motion, if established as a matter of law, will suffice for purposes of the United States' motion for summary judgment and, thus, this court need not and will not address each of the grounds the United States has raised. Rather it will restrict itself to only those grounds which address defendant's activities at *Szekely Nep* and will grant summary judgment on Counts I, II, and III of the complaint.

### A. *Assistance in Persecution—Counts I and II*

Count I alleges that to have been admitted under the Displaced Persons Act, as he was, defendant had the burden of proving that he was "the concern of the International Refugee Organization" ("IRO"). §§ 2(b) and 10, Displaced Persons Act, 62 Stat. 1009, 1013 (1948). Not of concern to the IRO, by virtue of Annex I, Part II of the IRO Constitution (62 Stat. 3037 *et seq.*), were persons who can be shown "to have assisted the enemy in persecuting civil populations of countries...." 62 Stat. 3051, 3052. Because defendant's activities at *Szekely Nep* and his advocacy of the persecution of Jews constituted assistance to the enemy regime of Nazi Germany in persecuting civilians, he was not "of concern" to the IRO and, thus, not a displaced person within the meaning of § 2(b) of the Displaced Persons Act; his admittance into the United States was unlawful; and his subsequent naturalization, therefore, was unlawful under § 316(a)(1) of the Act, 8 U.S.C. § 1427(a)(1). Count II invokes § 13 of the Displaced Persons Act, as amended, which provides that no visa shall be issued to any person who "advocated or assisted in the persecution of any person because of race, religion or national origin", and alleges that because of defendant's activities at *Szekely Nep* and his advocacy of the persecution of Jews, he was not eligible for a visa under § 13 and, thus, that his admittance into the United States and his subsequent

---

5. The Court stated, "In this capacity [as Responsible Editor of *Vilaglap*] at the now extreme right wing periodical, he had warmongering pictures published, and disparaged the Allies". Government's Exhibit 13–E, Judgment and Sentence of Ferenc Koreh, May 9, 1947.

naturalization were unlawful. The phrases "assisted the enemy in persecuting" and "advocated or assisted in . . . persecution" are concededly governed by the same legal standards, and the court will use the shorthand phrase "assistance in persecution".

That summary judgment is appropriate in this case is best exemplified by the positions of the parties as to whether defendant's activities at *Szekely Nep* constituted assistance in persecution. In a nutshell, defendant points to one case which requires active participation in an act of oppression against persecuted civilians and the United States points primarily to another case which held that anti-Semitic articles assist persecution by creating a climate of opinion in which such persecution is acceptable. Notably, defendant does not dispute that anti-Semitic articles were published or that *Szekely Nep* assisted in persecution while he was present, arguing only that he did not "actively" participate. But, as counsel for the defendant conceded at oral argument, if the court rejects his case and follows the United States' case it is game, set, and match because there are no material facts in dispute.

Thus, defendant has not challenged the fact that between 1938–1944, no newspaper or periodical could be published unless prior approval was granted by the Prime Minister. A license to publish was refused to any publisher or Responsible Editor who was considered politically unreliable and those who obtained licenses were those who, at a minimum, complied with the government's guidelines in respect to the political direction and content of their publication. Revesz Aff., ¶ 11. Defendant, who admits that he was the only person in the town in which *Szekely Nep* was published who was able to obtain the requisite license, travelled to Budapest in the fall of 1940 and did so.

As Responsible Editor, defendant was criminally and civilly liable for all articles where the author was unavailable or the article unsigned even if he was absent from the paper as long as his name appeared on the masthead as Responsible Editor, which it did between 1941 and 1944. *Id.* at ¶ 34. Among his responsibilities were the writing, reading, and editing of articles; meeting with Hungarian government officials to discuss the paper's contents and the types of articles the government thought useful; publishing news stories received from the government on pain of loss of license; and assuring that the government's policy regarding the political content and direction of the paper was implemented; indeed, defendant has admitted that *Szekely Nep* had to show an anti-Semitic profile to satisfy the Germans. Gov't. Exh. 8 at 503. It is stipulated that defendant wrote certain articles published in *Szekely Nep,* and he has admitted that when he became Responsible Editor and when he left that post, he told his staff what political direction the paper should take and what they could and could not publish. While he was concededly present, his position at *Szekely Nep* was full-time and his sole source of income.

It bears repetition that the United States relies only on defendant's activities and articles published when defendant was *admittedly* present at *Szekely Nep.* Thus, while the United States proffers that there were at least 200 anti-Semitic and anti-Allied articles during those periods between 1941–44 when defendant was Responsible Editor with many of those articles calling for specific persecutive measures against Jews and a number of them written by defendant, because defendant has denied that he wrote the anti-Semitic articles which appeared under his byline calling them (most belatedly) forgeries by the Romanian government, and because he alleges that he was not at *Szekely Nep* at all times (*see* note 4, *supra* ), the United States presses on this motion only 55 articles which, although not published under defendant's byline and 51 of them unsigned, were published when defendant was concededly present at the paper during all but approximately seven months during 1941 and 1942, articles which defendant does not attempt to characterize as anything other than what they were— anti-Allied, anti-Semitic, and advocating specific measures of persecution against Jews. (Exh. 14–A–14–GGG). It bears repetition, as well, that 164,000 Jews lived under virulent anti-Semitic laws in the region which *Szekely Nep* serviced when defendant was functioning as Responsible Editor and the anti-Allied

and anti-Semitic articles advocating the persecution of Jews pressed on this motion appeared. Not unimportantly, the first anti-Semitic article appeared in *Szekely Nep* on July 19, 1941, less than a month after Hungary joined the Axis. And even before December, 1941 when Hungary and the United States were in a state of war, *Szekely Nep* was publishing anti-American articles.

Anti–American articles published on defendant's watch vilified President Roosevelt; blamed Roosevelt, Prime Minister Winston Churchill, and American Jews for the outbreak and extension of the war; claimed that various American leaders, including Roosevelt, were Jewish and, therefore, untrustworthy; and attacked Roosevelt as being under the influence of his administration's "Jewish-blood members" (Gov't. Exh. 14–0, 14–DD, 14–GG, 14–P, 14–JJO).

The anti-Semitic articles were particularly virulent. The "alien-character" of the Jews was emphasized and Jews were described as constituting a separate and distinct race; Jews were portrayed as "traitorous, unscrupulous, cheating ... throughout ... Hungarian history" and a consistently dangerous element in Hungarian society responsible for the socioeconomic problems afflicting Hungary and the world; a portion of an article from the National Socialist German Workers Party publication was reprinted describing Jews as an "alien body", charging that "every Jew earns ten times more money than the average Hungarian", and concluding that "de-jewification of Hungarian life is demanded [even] by responsible elements within the government" and "everyone in Hungary is aware of the fact that a final solution may be achieved only by deporting Jewish elements"; Jews were described as "alien elements with diabolical skills" and as a "motley group of immigrants"; and, in the impoverished and poorly educated region which *Szekely Nep* reached, more than forty articles published while defendant was present blamed the Jews for the economic and social problems and the misery of the people in that region, reminded the readers of violations by individual Jews of the anti-Semitic legislation passed in 1938, 1939, and 1940, and called for harsher restrictions and punishments, including the suggestion that the homes of Jews be taken away. (*See, e.g.,* Gov't.Exh. 14–A, 14–I, 14–F, 14–Q, 14–W, 14–Z, 14–BB, 14–UU, 14–AAA). One article entitled "Defaming the Race" condemned an affair between a Christian woman and a Jewish man, and others condemned the "defamation of the race" to which Christian female domestic employees would be exposed by their Jewish masters, urging that Christians employ these women "so that these flowers of the Szekely pine forests may courageously say at last: 'Never again will we go to Jewish homes to serve'". Gov't.Exh. 14–FF, 14–HH, 14–LL. Those few articles referenced above were but the tip of the very dangerous and very extensive iceberg which, on defendant's watch, surfaced and remained out there for all to see, conditioning the Hungarian people in that region to accept Hungary's efficient persecution of Jews in all aspects of their lives.

But, says defendant, whatever may have appeared in *Szekely Nep* while he was Responsible Editor, he did not "actively participate" in an act of oppression against persecuted civilians; rather, passive accommodation was the extent of his involvement—he was, in his word, a mere "figurehead". Parenthetically, he concedes that anti-Semitic articles were published at times he was admittedly present at the paper and does not argue that he was ignorant of what was going on; indeed, implicit in his argument that he passively accommodated the persecutors is a concession that he knew what he was accommodating. And if those articles published during his watch are evidence of the "moderate centrist tone" this supposed "figurehead" somewhat inconsistently alleges he ensured (Def.Br. at 46), this court will eat its hat.

The case on which defendant relies, *United States v. Sprogis,* 763 F.2d 115 (2d Cir.1985), is not only not the mother lode defendant would have it be but the proposition for which it is cited by defendant has not been followed even in its own circuit. During World War II, Elmars Sprogis was a police officer in two Latvian towns—a puppet, performing, the court found, only "occasional ministerial tasks" for the Nazis, acts which

could not be considered "active" "assistance in persecution".

> ... Sprogis seems only to have passively accommodated the Nazis, while performing occasional ministerial tasks which his office demanded, but which by themselves cannot be considered oppressive ... Sprogis' passive accommodation of the Nazis ... does not, in our view, exclude him from citizenship under the DPA. To hold otherwise would require the condemnation as persecutors of all those who, with virtually no alternative, performed routine law enforcement functions during Nazi occupation. *Id.* at 122–123.

The court, therefore, excused acts which may well have been persecutional but were performed under something akin to duress—Sprogis had "virtually no alternative".

■ Defendant does not suggest that he had had no alternative or acted under duress when he obtained the license for *Szekely Nep* as its Responsible Editor and proceeded thereafter to publish the paper admittedly knowing what the government wanted and to the government's apparent satisfaction nor, of course, does he suggest that "occasional ministerial tasks" were the extent of his involvement, be it voluntary or involuntary. Any suggestion that he had "virtually no alternative" would be unavailing, in any event, under *Fedorenko v. United States, supra,* the case which established the standard for cases involving denaturalization and/or deportation on the ground of assistance in persecution. *Fedorenko* made quite clear that the plain language of the DPA (and, by analogy, the IRO Constitution) mandates that in connection with the persecution provision, it is the *objective* determination of what one had actually done that is determinative of whether he or she was eligible for a visa and that whether those acts were undertaken voluntarily or involuntarily was not relevant. In finding that Sprogis acted involuntarily, therefore, and thereafter according that fact determinative significance, the *Sprogis* court adopted a voluntariness ele-

ment in direct contravention of *Fedorenko,* perhaps one reason why *Sprogis* has not been followed.[6]

A mere two years later, the same circuit—the Second—decided the case on which the United States relies although, unlike defendant, who has "virtually no alternative", the United States cites other cases as well. The court in *United States v. Sokolov,* 814 F.2d 864 (2d Cir.1987), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988), affirmed the denaturalization of Vladimir Sokolov, a Russian living in the German-occupied Soviet Union, who worked voluntarily as a writer for and later also as deputy chief editor of the Russian language newspaper *Rech,* published by the German army. Writing under a pseudonym,

> Sokolov wrote anti-Semitic articles urging the Soviet population to support anti-Jewish/Bolshevik actions taken by the Nazis, and articles criticizing the United States and Great Britain and seeking to aid in their military defeat. In addition, as deputy chief editor of *Rech,* Sokolov edited articles with these same themes.

814 F.2d at 866.

· As relevant here, the court found that Sokolov was ineligible for a visa and, thus, had procured his citizenship illegally because he had advocated or assisted in the persecution of Jews.

> Webster's Dictionary defines 'persecution' as 'the infliction of sufferings, harm, or death on those who differ ... in a way regarded as offensive or meriting extirpation', and as 'a campaign having for its object the subjugation or extirpation of the adherents of a religion'. The Government has shown that Sokolov's work as a German army propagandist involved his 'advocating or assisting' in the persecution of Jews in the large area served by *Rech.* Although there was no showing of actual persecution of Jews in the Orel area resulting from these articles, it is plain on the face of DPA § 13 that advocating per-

---

6. *Sprogis* has only been cited in a handful of cases and even then only in support of boilerplate principles not at issue here. *And see Schellong v. U.S. I.N.S.,* 805 F.2d 655, 661 (7th Cir. 1986), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987) (rejecting *Sprogis* to the extent it held that personal involvement in persecution is necessary as inconsistent with *Fedorenko,* 449 U.S. at 512, n. 34, 101 S.Ct. at 750, n. 34).

secution in itself renders a person ineligible for a visa. In any case, such propaganda does assist persecution by creating a climate of opinion in which such persecution is acceptable ... Articles such as Sokolov's 'conditioned the Russian people into accepting and carrying out the National Socialist Policy in regards to the Jews', a policy of persecution.

814 F.2d at 874. Because Sokolov wrote anti-Semitic articles for *Rech*, articles very similar to those pressed here, he thereby advocated or assisted in the persecution of Jews. This conclusion, defendant agrees, was "compelled". Def.Br. at 28.

■ Defendant reminds the court, predictably, that on this motion for summary judgment the government does not press those anti-Semitic articles which, although under his byline, he denies having written and argues that, therefore, *Sokolov*, which addresses only Sokolov's writing (and not his editing) of anti-Semitic articles, does not take the government where it wishes to go. He is wrong. The district court in *Sokolov* found, albeit after trial, that to get a job at *Rech* a person had to be a convinced opponent of "Jewish bolshevism" and that Sokolov "naturally" wrote anti-Semitic articles because that was what was expected of him and of all of his co-workers. *Id.* Here, even assuming for purposes of this motion that defendant did not write the articles attributed to him, there is ample evidence of what it meant to be a Responsible Editor, the type of person who could obtain that position, what was required of that person, how defendant represented the paper in official circles and was accountable to the government for the unsigned articles; the articles that were published while defendant was concededly present and which he caused to be published by, at minimum, maintaining his position as Responsible Editor thus ensuring the continued viability of the paper; and the effect on the population—Jewish and non-Jewish—of what was done on his watch. Defendant has come back with utterly nothing of record to refute or dispute that evidence.

■ In any event, as *Fedorenko* and its progeny make clear, "assistance in persecution" is broadly construed, and personal involvement in atrocities is unnecessary to a finding that citizenship was illegally procured under the DPA. *See, e.g., Sokolov, supra; United States v. Schmidt*, 923 F.2d 1253 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). Just as one's "mere" service as a concentration camp guard has been deemed sufficient for a finding of assistance of persecution in virtually every case which has considered the issue because such service helped to ensure the inmates' imprisonment and eventual destruction, defendant's service as Responsible Editor of *Szekely Nep* assisted in persecution because it helped to ensure the continued publication of articles which articles created a climate of opinion in which the persecution of Jews was acceptable to the Hungarian people and that persecution thus facilitated. Stated somewhat differently, the poison which spewed from *Szekely Nep*'s pages while defendant was concededly present and functioning as Responsible Editor enabled the anti-Semitic legislation of 1938, 1939, and 1941 to be more easily enforced as the population was indoctrinated and increasingly acquiesced. And, of course, worthy of mention is the fact that for two years after defendant supposedly left *Szekely Nep*, his name, at his choice, remained on the masthead as Responsible Editor, enabling the paper to continue to publish its poison.

■ Defendant also attempts to distinguish *Sokolov* on the ground that *Rech* was owned by the "Nazi German Army" and had as its primary objective promotion of Nazi ideology in Nazi-occupied Russia while *Szekely Nep*, at least before the occupation, was privately owned, with no connection to Nazi Germans, providing Hungarians with balanced, politically moderate news. Def.Br. 29. This rather bizarre characterization of what *Szekely Nep* was, in fact, printing aside, no court has suggested that assistance in persecution under § 13 of the DPA requires, as defendant puts it, "egregious conduct that was a necessary link to the objectives of Nazi Germany...." *Id.* at 31. Even if there were such a requirement, however, *Szekely Nep* published anti-Semitic material directly from official German press sources and the connection of other anti-Semitic articles in

*Szekely Nep* to the objectives of Nazi Germany is clear. For example, by June, 1941, German pressure on Hungary to solve the "Jewish question" had increased. *Szekely Nep*, the very next month, identified Hungarian Jews as a threat and continued to do so, describing Jews over and over again as "aliens" and as, among other things, a dominating and exploiting force in the Hungarian economy. Indeed, as noted earlier, defendant has admitted that *Szekely Nep* had an anti-Semitic profile to please the Germans. Gov't.Exh. 8 at 503.

As a matter of law, then, defendant's activities at *Szekely Nep* in 1941 and 1942 constituted advocacy and assistance in persecution rendering him ineligible for a visa under § 13 of the DPA, and "assisted the enemy in persecuting civil populations"[7] within the meaning of the IRO Constitution rendering him not "of concern" to the IRO. The United States' motion for summary judgment will be granted on Counts I and II of the complaint.

### B. *Movement Hostile—Count III*

■ Summary judgment will also be granted on Count III of the complaint because, as a matter of law, defendant's activities at *Szekely Nep* in 1941 and 1942 constituted membership and participation in a movement hostile to the United States,[8] rendering him ineligible for a visa under § 13 of the DPA,[9] a conclusion which flows virtually inexorably from much of what has been set forth above. Indeed, the *Sokolov* court, after

finding that Vladimir Sokolov had assisted in the persecution of Jews by virtue of his anti-Semitic propaganda, held, without further discussion, that his pro-Nazi and anti-Allied articles also rendered him ineligible for a visa because they amounted to participation in a "movement hostile" to the United States. 814 F.2d at 874.[10] *See also Marschalko v. Shaughnessy*, Civ. No. 63–138 (S.D.N.Y., March 9, 1951) (Gov't.Exh. 32) (employment as a member of the editorial staff and writer with an anti-Semitic, anti-Allied Hungarian newspaper from 1934–44 constituted participation in a movement hostile to the United States; through his employment, defendant allied himself to that movement and acquiesced in activities opposed to the policies of the United States). Parenthetically, to the extent that the *Sokolov* court appeared to move away from the anti-Semitic articles and into those that were pro-Nazi and anti-Allied before finding participation in a movement hostile, it is not at all clear, at least to this court, that it was necessary to do so. Anti-Semitism may or may not be "hostile" to the United States but it surely strikes at the very foundation of our "form of government", itself disqualifying under § 13 of the DPA.

Defendant here retraces, albeit in passing, certain of the arguments made vis-a-vis the assistance in persecution ground, which this court again rejects, and, as before, he cites no disputed facts. Rather, he focuses his opposition on two points: first, that only organizations on the Displaced Persons Com-

---

7. Because this court has found that the phrases "assistance in persecution" and "assisted the enemy in persecuting civil populations" as used in § 13 of the DPA and § 2(a) of the IRO Constitution, respectively, are unambiguous and unambiguously encompassed defendant's conduct, it need not and will not consider the interpretations of these phrases by Michael Thomas and Mario DeCapua, who set policy for the authorities charged with implementation of the IRO and DPA and who concluded that defendant's admitted conduct—even if as a "figurehead" or if he were unaware or absent—rendered him ineligible for a visa because it assisted in persecution in violation of the DPA and the IRO Constitution. In the court's view, however, it could have considered these conclusions on this motion because, again, defendant has come back with no facts to refute them.

8. "Movement" has been defined as a group or organization which rendered aid and comfort to the enemies of the United States prior to and during World War II. *United States v. Osidach*, 513 F.Supp. 51, 109 (E.D.Pa.1981).

9. § 13 of the DPA provides, in pertinent part, that one is ineligible for displaced persons status if he or she was a "member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States". 64 Stat. 227.

10. The court also held that Sokolov should be denaturalized because the pro-Nazi, anti-Allied articles assisted enemy forces in the war with the Allies so that he was not "of concern" to the IRO, and because he wilfully misrepresented and concealed the truth concerning his employment with *Rech* as a German army propagandist.

mittee's ("DPC") "inimical list", which *Szekely Nep* was not, can be movements hostile to the United States, and, second, that only organizations—or newspapers or publications—which espoused Nazi ideology can be movements hostile to the United States, with more than mere employment at such newspaper or publication required.

█ These allegations will be disposed of summarily. With reference to the former, the unrefuted affidavit of Mario DeCapua, one of the authors of the inimical list, states that the list "was not an exhaustive list of every organization considered hostile to the United States". Gov't.Exh. 3 at ¶ 4. Moreover, and wholly aside from DeCapua's statement, defendant has pointed to no case which requires that before an organization can be considered a movement hostile its name must appear on the list, and this court has found no such case; certainly, cases such as *Sokolov* and *Marschalko* do not even refer to an inimical list and every case which has considered the movement hostile provision of the DPA has concluded that employment by an organization which aided the enemies of the United States, in a position that entailed compliance with or promotion of the policies of that organization, constituted participation and membership in a movement hostile—list or no list. And, of course, the various DPC rejection memoranda the United States has submitted on this motion underscore the fact that the DPC rejected the applications for displaced persons status of persons affiliated with organizations not appearing on the inimical list. *See* Gov't.Exh. 19–25.[11]

█ Defendant's alternative argument that only organizations—or newspapers or publications—that espoused Nazi ideology can be considered hostile to the United States is similarly without merit. There is no such requirement in the DPA—"*any* movement which is or has been hostile to the

United States", 64 Stat. 227 (emphasis supplied)—and, again, there is no such requirement in any case which has discussed the movement hostile provision. But even if there were such a requirement, *Szekely Nep*, as discussed earlier, published Nazi ideology and propaganda during defendant's service as Responsible Editor, demonstrating his commitment thereto and encouraging the Hungarian people to continue their fight against the Allies. Defendant was a member of or participated in a movement hostile to the United States.[12]

### III. *Conclusions*

Defendant was ineligible for the visa he received because he advocated and assisted in the persecution of Jews, because he assisted the enemy in persecuting civilians, and because he was a member of and participant in a movement hostile to the United States. Because he was not eligible for a visa, he was not lawfully admitted to the United States and his citizenship, therefore, was illegally procured. The United States' motion for summary judgment will be granted on Counts I, II, and III of the complaint. Defendant's naturalization will be revoked and his certificate of naturalization will be returned to the United States within thirty days of the date of this order.

---

11. Thus, e.g., the editor until 1942 of a privately owned provincial Hungarian newspaper and an applicant who had been associated with a Russian language pro-German newspaper in occupied Prague were rejected because of their membership or participation in a movement hostile. *See* Rejections of Lazlo Gero and Basil Glaskoff.

12. While Count III explicitly refers, at § 49, to defendant's employment as a Press Officer in the Press Department of the Hungarian Ministry of Propaganda in 1944, the parties, presumably by reference to the reallegation and incorporation in Count III of the preceding paragraphs of the complaint, have treated it as also covering defendant's activities at *Szekely Nep* and *Vilaglap*. This court has done so as well.