**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Elmars SPROGIS, Defendant-Appellee.**

**No. 391, Docket 84–6223.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1984.

Decided May 31, 1985.

Jeffrey N. Mausner, Trial Atty., Office of Special Investigations, Crim. Div., Dept. of Justice, Washington, D.C. (Neal M. Sher, Director, Michael Wolf, Deputy Director, Martin H. Sachs, Trial Atty., Dept. of Justice, Washington, D.C., of counsel), for plaintiff-appellant.

Ivars Berzins, Babylon, N.Y. (Joel A. Brenner, Ronald M. Organ, Ivars Berzins, P.C., Babylon, N.Y., of counsel), for defendant-appellee.

Before LUMBARD, MANSFIELD and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

This case presents, in its most difficult and troubling form, the question of whether a naturalized citizen's conduct while a native police officer in a country invaded and occupied by the Nazis during World War II constitutes an involvement in the Nazis' persecution of civilians sufficient to require the revocation of his citizenship over 40 years later. The government appeals from the May 21, 1984 dismissal, by Judge Altimari, of its suit, brought in the Eastern District under § 340(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1451(a) (1982), to cancel the naturalization of Elmars Sprogis and to vacate an April 16, 1962 order of the Southern District of New York granting him United States citizenship. Judge Altimari dismissed the suit based on his conclusion that the government failed to prove, by clear, unequivocal and convincing evidence, that Sprogis assisted in persecuting Jews and other civilians while serving as a policeman in Nazi-controlled Latvia during World War II.

On appeal, the government contends that, even in the absence of additional proof, Sprogis' admissions establish that he assisted in persecution. We agree substantially with Judge Altimari's decision that the government offered insufficient proof of assistance in persecution.

Elmars Sprogis was born in Latvia on November 26, 1914. During World War II, he worked there as a police officer. On November 25, 1950, Sprogis entered the United States, having gained a visa from U.S. immigration officials in Wentorf, West Germany pursuant to the Displaced Persons Act of 1948, Pub.L. No. 80–774, 62 Stat. 1009 (DPA). On his immigration papers, including his I–144, a form filled out by all persons immigrating under the DPA, Sprogis disclosed his Latvian police service and stated that he had not become involved in persecuting any civilians.

The government, in a six-count complaint, advanced two theories for revoking Sprogis' citizenship under § 340(a) of the INA.[1] It asserted that his citizenship was illegally procured, under 8 U.S.C.

---

1. The statute provides for the revocation of citizenship "illegally procured or ... procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a) (1982).

§§ 1427(a)(1), 1427(a)(3), 1429, because of his assistance in persecuting Soviet prisoners of war, Jews and other civilians while a Latvian police officer and because of his failure to disclose that assistance on his immigration papers.[2] In addition, it asserted that his citizenship was procured through misrepresentations concerning his participation in persecution.

A bench trial was held before Judge Altimari in October 1983. Most of the evidence focused on Sprogis' alleged involvement in three incidents of persecution: 1) the detention and forced transport of nine Jews and the confiscation of their property on July 19, 1941; 2) the mass execution of approximately 200 Jews at Litene, Latvia on August 1 or 2, 1941; and 3) the confiscation of property from the homes of arrested Jews.

The government called Dr. Raul Hilberg, an expert historian who has studied the Holocaust for over 35 years. Hilberg testified that Germany invaded Soviet-controlled Latvia on June 22, 1941, occupying Gulbene on or about July 5, 1941 and the entire country by the end of the summer. According to Hilberg, there were approximately 83 Jews in Gulbene at the time of the Nazi invasion. Throughout Latvia, the Nazis initiated a systematic effort to seize and shoot all Jews except for a small number of skilled laborers. Usually, but not always, a special unit of Latvians, under the direction of the Nazis and known as the Arajs Kommandos, carried out the executions. In some cases, the Nazis, asserting their authority over the local Latvian police, used the police to locate, arrest, guard, transport or execute Jews, and to confiscate their property. Hilberg conceded, however, that the role of the local Latvian police varied from region to region.

The government also introduced Sprogis' sworn statements of March 9, 1976, November 25, 1981 and February 24, 1982 and his September 24, 1983 deposition, all of which were taken by immigration officials and government lawyers in New York.

Sprogis also testified on his own behalf: He graduated from military college in 1937 and served in the Latvian Army until June 1940, when the Soviets occupied Latvia. During the Soviet occupation, he served in the Latvian Territorial Corps, a group formed by the Soviets. In the summer of 1941, he was stationed in Cesis, but he left on July 5 or 6 and travelled to Riga, Latvia, in search of his brothers, and then to Gulbene, an eastern Latvian town of approximately 2,900 people, where his wife was living and working. On July 16, he joined

**2.** Citizenship is illegally procured any time the applicant has failed to comply with any of "the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States,* 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981). The government alleges that Sprogis' naturalization was obtained illegally because he is not a person of good moral character and because he was not admitted lawfully into the United States. *See* 8 U.S.C. §§ 1427(a)(1), 1427(a)(3), 1429 (1982). The government asserts that Sprogis is not a person of good moral character because of his assistance in persecution and, under 8 U.S.C. § 1101(f)(6) (1982), because of his failure to disclose that assistance during the immigration process. The government asserts that Sprogis' admission was unlawful, under the Immigration Act of 1924, Pub.L. No. 68–139, § 13(a), 43 Stat. 153, 161, because it was based on an invalid visa. The visa, according to the complaint, was invalid, under sections 2(b), 10 and 13 of the Displaced Persons Act, because of Sprogis' assistance in persecution and because of his failure to disclose that assistance to immigration officials. Section 2(b) of the DPA limits immigration to displaced persons as that term is defined in the Constitution of the International Refugee Organization. 62 Stat. 1009. That constitution excludes, among others, "any ... persons who can be shown: (a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations...." Constitution of the International Refugee Organization, *opened for signature* Dec. 15, 1946, 62 Stat. 3037, 3051, T.I.A.S. No. 1846. Section 10 of the DPA provides that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." 62 Stat. 1009, 1013. Finally, that part of section 13 relied upon by the government provides: "No visas shall be issued under the provisions of this Act ... to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin." Act of June 16, 1950, Pub.L. No. 81–555, § 11, 64 Stat. 219, 227.

the Gulbene police force at the request of the chief of police, a friend. Sprogis' father had previously served as chief of police in Gulbene. Sprogis continued to serve on the police force, as assistant precinct chief, until August 10, 1941, although he maintained that after the first of August he missed some work because of a knee injury. On September 8, 1941, he left Gulbene in order to become assistant chief of police in Madona, a larger city. Eventually he became police chief in Madona.

Sprogis testified that the Gulbene police were under the control of the Nazis. He consistently denied, however, that he ever arrested any Jews. He asserted that all Jews in Gulbene had been arrested prior to his joining the police force there on July 16. According to Sprogis, the Nazi presence in Gulbene was centered not at the police station but at the Gulbene military airport where Major Schaeffer was in charge. Reporting to Schaeffer was a Latvian unit, headed by Captain Lietuvietis, responsible for guarding the airport and the prisoners the Nazis held there. Sprogis asserted that the police had no authority over the military airport and that he visited it only once.

Sprogis also testified concerning his role in the confiscation of the property of arrested Jews and in the July 19, 1941 incident involving the detention of nine Jews at the Gulbene police station. Initially, Sprogis, in his 1981 sworn statement, denied any involvement in either the confiscation of property or the July 19 incident. However, subsequent to that interview, the government produced four documents, which, according to Sprogis, refreshed his memory concerning the July 19 incident.

The first document, dated July 19, 1941 and signed by Sprogis, F. Ermiks, and one other, reads, as translated:

The following sums of money that were found on July 19, 1941 on the arrested Jews were confiscated and turned over to the mayor of Gulbene for his disposition:

*    *    *    *    *    *

A total of six thousand four hundred ninety three (6,493) rubles.

One hundred rubles (100.00 rbl.) out of this sum have been paid to four farmers of the Municipality of Litene for transporting the Jews along a dirt road from Litene to the police precinct in Gulbene— see enclosed receipts.

Six thousand three hundred ninety three (6,393.00) rubles are being turned over to the city administration of Gulbene.

The second document is like the first, except that it records the confiscation and delivery to the mayor of the arrested Jews' personal property. The third document, of the same date and concededly written and signed by Sprogis, reflects the payment of 25 rubles to a farmer who had transported the Jews from Litene to Gulbene.

The fourth document is a statement, prepared and signed by Sprogis on October 17, 1942 in response to a Nazi investigation of alleged irregularities in the disposition of confiscated property, in which Sprogis asserts, as he did at trial, that his involvement in confiscations was limited to the performance of incidental administrative tasks. Translated, the statement reads as follows:

From July 16 to August 10, 1941, I was Assistant Chief of Police in Gulbene.... During the first days of my employment, I managed police organizational matters in the town and in the counties, and also office space assignments. Chief A. Bergs, in coordination with the Town Commandant, instructed me to take over the former Gulbene Region Court Building in order to establish police offices there. The Chief, at that time, did not give me the assignment to keep track of and to manage things taken away from, i.e., goods, money and valuables, confiscated from the Jews. I have not been present when all this was being done, and I also have not given any orders regarding this matter. Only once, when the Senior Policeman of Litene County sent Jews together with their confiscated belongings to the Gulbene Police, I turned in the certified lists, with the money, together with valuables, right there at the police office to Mrs. Olga

Skenderis, the senior clerk at the office. She checked them for accuracy. After the check was completed, Mrs. Skenderis informed me that the money and valuables on the certified lists checked out with the money and valuables turned in. Subsequently all instructions regarding this matter, pertaining to valuables and the money, as well as turning in of these items were issued by and also handled by Chief A. Bergs. I do not know anything about the valuables confiscated from the Jew Ceslers and other (Jews) from Gulbene. In late July, Chief Bergs gave instructions to turn in all the Jewish money and valuables immediately to the Gulbene Town Council. However, since the council did not accept them, the Chief ordered that the money and the valuables be turned over to Captain Sefers (Translator's note: German spelling—Schaeffer), the Gulbene Town commandant. I signed the cover memorandum instead of the Chief, since I was given an order over telephone by the Chief, who at that time was at the Commandant's office, to immediately deliver the money and the valuables to the Commandant. The delivery was made by Skenderis and Mrs. Vigants. Since this matter, as I mentioned above, was handled by the Chief himself, I did not get involved any further regarding the turning over of the money and the valuables. Furthermore, I had other responsibilities to look after, and Chief Bergs himself handled all the service related matters with the local Commandant on location. There is nothing else that I can further clarify in this matter.

Confronted with these documents, Sprogis, in his deposition and at trial, acknowledged minimal involvement in the July 19 incident. He testified that when he arrived at the police station on July 19, nine arrested Jews were already there. The prisoners had been arrested by the Nazis in Litene or Balvi. They were held in a small room for several hours until Captain Lietuvietis arrived and took them to the Nazi prison at the Gulbene military airport, where, Sprogis realized, they would probably await their execution. Sprogis testified that he was the highest ranking officer at the Gulbene police station while the Jews were forcibly detained there, and, in his disposition, he conceded that he ordered other policemen to guard the prisoners. However, at trial, he denied ever explicitly giving such an order, noting that it was unnecessary for him to become actively involved in the detention because at the time he arrived, the policemen were already guarding the prisoners and awaiting the arrival of the Nazi officer whom they had notified.

In addition, Sprogis contended that the property of the nine Jews had been confiscated before he arrived. He asserted that, as he understood it, the police delivered all of the property with the exception of 100 rubles to the mayor. Sprogis admitted that he paid the remaining 100 rubles to the four farmers who had transported the prisoners from Litene and that he signed documents recording those payments. Sprogis denied, however, any further involvement in the incident, which, he claimed, was the sole occasion during his police service when he had any contact with arrested Jews or their property.

In his statements and at trial, Sprogis also denied any involvement in the mass execution of Jews that took place in early August 1941 in Litene, about 12 miles east of Gulbene. At trial, Sprogis further claimed that the Gulbene local police played no role in those executions, although in earlier statements he had said he was unsure of their involvement.

Sprogis did concede at trial that he was in Litene on the day the mass execution occurred, but he claimed he was there, at the insistence of the Madona district police chief, only to witness, on behalf of the police, the execution of a photographer named Berzins, who he believed had been convicted of spying for the Soviets. Sprogis also testified that, as he was leaving Litene, he saw a column of 100 or 150 guarded prisoners marching toward the army camp where Berzins had been executed. According to Sprogis, he learned the next day from Captain Lietuvietis that

the Arajs Kommandos had executed those Jewish prisoners. Sprogis testified that Lietuvietis explained to him that most of the executed Jews had been captured at the Latvian-Russian border and that they had been held initially at the military airport in Gulbene before being transferred, on the order of Major Schaeffer, to Litene.

In addition to Sprogis' statements, the government presented the testimony of six former immigration officials. Five of the officials had been involved in the administration of the DPA on a daily basis, and several of them had been involved in processing Sprogis' visa and citizenship applications. Each witness testified to the procedures by which the government evaluated applications for entry under the DPA, and each asserted that Sprogis' admitted activities, as characterized by the government's attorney, would have required them to deny Sprogis entry under the Displaced Persons Act.

For completeness, and to illustrate the difficulties in judging events over forty years in the past, we summarize the depositions of Alfred Sietnieks and Feliks Ermiks, which the government also introduced at trial. However, we give them no weight because the government does not rely on them on appeal and because Judge Altimari declined to give them any weight, finding them unworthy of belief. Both depositions, which in several critical respects contradict Sprogis' testimony, were conducted with the aid of a translator in Riga, Latvia on November 15–16, 1982, before the Senior Assistant of the Public Procurator of Latvia, S.S.R. and attorneys for Sprogis and the government.

Sietnieks, in his deposition, claimed the Latvian police arrested him in early July 1941 as a Soviet activist and imprisoned him at the Gulbene military airport with others, including Jews. He also claimed that during his imprisonment, he and fellow prisoners, at the direction of Sprogis, moved property and furniture from the unoccupied apartments of arrested Jews to another apartment, which he believed belonged to Sprogis and which was full of similar property.

Feliks Ermiks, the other deponent, claimed to have served under Sprogis on the Gulbene police force. According to Ermiks, Sprogis, at the direction of the Nazis, ordered the arrest of all Jews in the area. In addition, Ermiks asserted that the Gulbene police force, including Sprogis, participated in transporting and guarding approximately 200 Jews just prior to their execution at Litene on August 1 or 2, 1941. All of the executed Jews had been, prior to their execution, imprisoned at the Gulbene airport, according to Ermiks.

Finally, Sprogis, besides his own testimony, presented that of his former wife, Daina Mucenieks. Mucenieks, despite memory lapses, testified that although she was unsure of her husband's official duties as a police officer, she did not recall his ever bringing furniture or other personal property to their home. Sprogis also put in evidence a number of documents, including a transcript of a 1977 interview of Ermiks, conducted by the Soviets, parts of which contradicted Ermiks' deposition testimony.

On May 18, 1984, the district court, in a lengthy and thorough opinion, dismissed the government's suit. The court concluded that in order to prevail under any of its theories, the government had to show that Sprogis assisted in the persecution of Jews or other civilians and that the government had not satisfied its substantial burden of proving that assistance by " 'clear, unequivocal, and convincing' " evidence which does "not leave 'the issue in doubt.' " *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981) (quoting *Schneiderman v. United States,* 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796 (1943)). Instead, Judge Altimari found, after exhaustively reviewing the proof, that there was "no credible evidence that Sprogis personally arrested or ordered the arrest of a Jew or walked the streets of Gulbene or Litene with the demeanor of a uniformed or armed conqueror.... [T]he evidence indicates that

he performed the duties of an ordinary police officer."

In reaching that decision, Judge Altimari discounted the testimony of the former immigration officials, finding it only slightly probative on the issue of whether Sprogis had assisted in persecution. He also, as previously noted, discounted the videotaped depositions of Ermiks and Sietnieks. After viewing those videotapes, he concluded that the testimony was entitled to no weight because it was uncorroborated, inconsistent and equivocal. In addition, Judge Altimari expressed concern that the depositions were conducted under potentially coercive conditions and that the Soviet official present sought to limit Sprogis' cross-examination of the witnesses.

On appeal, the government argues that the district court erred, as a matter of law, in failing to accord the testimony of the former immigration officials sufficient weight and in failing to find, on the basis of that testimony and Sprogis' admissions, that Sprogis had assisted in persecuting civilians.[3] The government concedes that its case depends on a showing of such assistance, and it does not contest the district court's decision to discount the videotaped deposition testimony of Ermiks and Sietnieks.

Of course, the concept of assistance in persecution is not capable of a precise definition. Recently, the Supreme Court, without offering a general definition, noted:

[A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates

on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems....

*Fedorenko*, 449 U.S. at 512–13 n. 34, 101 S.Ct. at 750 n. 34. This case obviously falls between the extremes of the death camp barber and the weapon wielding guard and presents the difficult problem of where to draw the line. However, we agree with the district court that Sprogis' admissions are insufficient to support a finding that Sprogis assisted in persecution while serving as a police officer in Latvia.

■ The government bears a heavy burden of proof in attempting to revoke an individual's citizenship. Because citizenship is such a precious right, the government to succeed must prove its case by clear, unequivocal, and convincing evidence which does not leave the issue in doubt. *Fedorenko*, 449 U.S. at 505, 101 S.Ct. at 747. In addition, "the facts and the law should be construed as far as is reasonably possible in favor of the citizen." *Schneiderman v. United States*, 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943).

■ The government failed to sustain its substantial burden of proof. Although much of the evidence was, almost of necessity, conflicting in certain respects because of the lapse of time, Sprogis' statements and the documents he signed, the only proof the government now offers, lend ample support to Judge Altimari's factual finding that Sprogis' involvement with Nazi persecution was limited to the performance of ministerial tasks. In addition, the only testimony before the district court by anyone with first-hand knowledge of Sprogis' involvement in the incidents charged was that given by Sprogis himself. Thus, the impression that he, as a witness, made on

---

**3.** Included in the government's argument is the assertion that the district court improperly read a voluntariness requirement into the DPA's prohibition against assistance in persecution. We find no merit in that assertion. Although the district court, in attempting to define the word

"assistance," did discuss the legal concepts of aiding and abetting and the necessity that the abettor share the intent of the principal, it did not, ultimately, base its decision on a conclusion that denaturalization requires a voluntary assistance in persecution.

the district judge, as trier of the facts, was critical. In a case of this sort, we owe special deference to the trial judge's conclusions about the weight of the evidence.

The only credible evidence that might have implicated Sprogis in persecutorial conduct was that connecting him with the July 19, 1941 arrest and detention of nine Jews and the confiscation of their property. However, none of the credited evidence of Sprogis' involvement in that incident indicates that he either ordered or participated in the arrest of the prisoners, their delivery to the Gulbene police station, or the confiscation of their property. Nor is there any evidence that Sprogis ordered or participated in the transfer of the nine prisoners to the Nazis. In addition, faced with conflicting evidence on the issue, the district court concluded that there was "no proof that Sprogis ordered [the prisoners] detained at the Gulbene police station." Since that conclusion is supported by evidence and was based on Judge Altimari's evaluation of Sprogis' in-court explanation of his prior, seemingly inconsistent statements, we do not believe it is clearly erroneous. Accordingly, we accept it. Fed.R. Civ.P. 52(a).

It is true that Sprogis paid certain farmers who had already transported the prisoners to the police station and that he signed documents reflecting those payments. Sprogis also signed papers recording the disposition which the police had made of the prisoners' property. Finally, he was present at the police station during the detention of the prisoners and he allowed their incarceration to continue. However, these were not acts of oppression. They do not amount to the kind of active assistance in persecution which the DPA condemns. See Laipenieks v. I.N.S., 750 F.2d 1427, 1432 (9th Cir.1985) (holding that assistance in persecution under 8 U.S.C. § 1251(a)(19), a companion statute to the DPA, requires "proof of personal active assistance or participation in persecutorial acts").

The clearest cases of assistance in persecution have been those in which an individual, often while employed at a concentration camp, has personally arrested or fired on detained civilians, or has ordered others to do so. See Fedorenko, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); United States v. Linnas, 527 F.Supp. 426 (E.D.N.Y.1981), aff'd mem., 685 F.2d 427 (2d Cir.), cert. denied, 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 146 (1982); United States v. Koziy, 728 F.2d 1314, 1318 (11th Cir.), cert. denied, — U.S. —, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984). In other cases, courts have characterized less hostile conduct as assistance in persecution, but in each of those cases, the individual condemned as a persecutor had actively participated in some act of oppression directed against persecuted civilians.

In United States v. Dercacz, 530 F.Supp. 1348, 1351 (E.D.N.Y.1982), for example, a former Ukrainian policeman who patrolled the streets, detained Jews who violated Nazi regulations and reported those who assisted the Jews was found to have assisted in persecution. Similarly, in United States v. Osidach, 513 F.Supp. 51, 96–99 (E.D.Pa.1981), a former policeman who acted as an interpreter when the Nazis interrogated detained Jews and who patrolled the streets of a Jewish ghetto, enforcing the Nazis' oppressive laws, was found to have assisted in persecution.

None of these cases persuades us that Sprogis' conduct, as established at trial, amounts to active participation in persecution. Rather than personally carrying out Nazi-ordered oppression against Jewish populations, as the policemen in the above cited cases had done, Sprogis seems only to have passively accommodated the Nazis, while performing occasional ministerial tasks which his office demanded, but which by themselves cannot be considered oppressive. There is no clear evidence that he made any decision to single out any person for arrest and persecution or that he committed any hostile act against any persecuted civilian. Sprogis' passive accommodation of the Nazis, like that of so many other civil servants similarly faced with the Nazis' conquest of their homelands and the

horrors of World War II, does not, in our view, exclude him from citizenship under the DPA. To hold otherwise would require the condemnation as persecutors of all those who, with virtually no alternative, performed routine law enforcement functions during Nazi occupation.

The government places great emphasis on the fact that Sprogis joined the police force in Gulbene following the Nazi invasion of Latvia, suggesting that it establishes that he was a voluntary participant in the Nazis' persecution. We disagree. Sprogis had attended military college in the 1930's and, following graduation, had worked exclusively as a soldier. When the Nazi invasion of Latvia prevented continued military service, Sprogis turned to the closely related field of police work. He joined the police force in the small town of Gulbene where his father had previously served as police chief and where he might reasonably have expected he could earn a living performing typical police duties, while avoiding involvement in Nazi atrocities. Such behavior does not indicate a desire or even a willingness to assist the Nazis or participate in their heinous conduct.

We also can give no weight to the government's argument that the testimony of the former immigration officials compels a conclusion that Sprogis assisted in persecution. Aside from describing the procedures pursuant to which the government processed applications for citizenship under the DPA, those officials testified that the following conduct would have been sufficient to disqualify an applicant for immigration under the DPA: 1) paying farmers to transport arrested Jews to a police station; 2) involvement in the confiscation of property from Jews; 3) attendance in an official capacity as a police officer at a location where Jews were held prior to being shot; and 4) ordering a policeman to

guard arrested Jews. We agree with Judge Altimari that, at least on the issue of whether Sprogis assisted in persecution, the probative value of the immigration officials' testimony is slight. They based their opinions not on a consideration of all the evidence before the district court, but on a consideration of only a part of that evidence, as characterized by the government attorney questioning them. To the extent the government attorney mischaracterized Sprogis' conduct or to the extent the witnesses were misled by their selective consideration of the evidence, their conclusions are irrelevant. Further, the immigration officials' opinions regarding evidence which would have led them, in 1950, to withhold permission to immigrate cannot be dispositive on the legal issue which must be decided by the court, namely, what constitutes assistance in persecution.[4] *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

It is, of course, virtually impossible to determine what role Sprogis played in the events that occurred in Latvia over forty years ago; however, we need not do that. Instead, we have the limited task of reviewing the district court's determination that the government failed to prove clearly, unequivocally and convincingly that Sprogis, while serving as a police officer, personally assisted in persecuting civilians. We agree with that determination.

The judgment of the district court is affirmed.

MANSFIELD, Circuit Judge (concurring):

I concur only because the government failed to sustain its heavy burden of establishing by clear, unequivocal and convincing evidence that Sprogis *actively* assisted in persecuting Jews and other civilians, *Fe-*

---

**4.** *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), does not require us to accord the former immigration officials' testimony greater deference. In *Fedorenko*, the Supreme Court held only that similar testimony was relevant to the issue of whether an applicant's misrepresentations made in order to gain a visa were material. *Fedorenko* did not suggest that courts are bound by former immigration officials' conclusions on the wholly different issue of whether particular conduct constitutes assistance in persecution.

*dorenko v. United States*, 449 U.S. 490, 505 (1981), and because I cannot label clearly erroneous Judge Altimari's discounting of the testimony of certain witnesses. However, I do not share the majority's view that Sprogis' conduct amounted to mere "passive accommodation of the Nazis" and that such persons had "virtually no alternative".

This is not the case of a minor employee performing some insignificant or subordinate ministerial tasks without knowledge of Nazi oppression. It is the story of a person who *volunteered* to become a policeman and Assistant Precinct Chief of Gulbene, a town of about 2,900 people, after his country had been overrun by the Nazis. We can almost take judicial notice that at that time Nazi pogroms and persecution of the Jews was generally known, particularly to persons engaged in law enforcement and possessed of Sprogis' education and background. Under these circumstances a volunteer must have reasonably anticipated that as a police official he would probably be relied upon by the Nazis for assistance in the performance of their unsavory tasks. Indeed, Sprogis conceded that the Gulbene police were under the control of the Nazis when he joined the force. Thereafter he performed so satisfactorily that within two months he became Assistant Chief of Police in a larger city, Madona, and eventually its Chief of Police.

Since I did not observe Sprogis when he testified I cannot change the district judge's appraisal of his credibility. However, I am bothered by the fact that he initially denied any involvement in the arrest of the nine Jews, his making of payment to farmers for having transported them to his police station, his order that the Jews be guarded there for several hours until they were taken by a Nazi officer to the Nazi prison at the airport where, according to Sprogis, they would probably await their execution, and his confiscation of their property. It was only when he was confronted with telltale specific documents signed by him, reporting to the Nazis on his participation in these activities, that he changed his story and admitted his involvement but sought to minimize it.

Under ordinary circumstances such an impeachment of the defendant, particularly in view of his strong motive to lie about his involvement, would call for rejection of post-impeachment efforts to explain away his conduct as too ministerial to incriminate him. In my view the trial judge and the majority here are extraordinarily charitable in attributing Sprogis' testimonial about-face to a lack of memory based on his present age and the passage of 40 years since these events occurred. However, if (as Sprogis states) this was the only occasion when he ever engaged in such conduct, one would reasonably expect it to have made a life-long impression on him, particularly since, in response to a Nazi investigation into disposition of confiscated property, he one year later rendered a personal report reviewing his involvement in a minute detail. Moreover, our "difficulties in judging events over forty years in the past" (Maj.Op. 120) are largely of Sprogis' own making. If, in response to inquiries by immigration officials in 1950, when he successfully sought entry into the United States, he had recounted the events at issue, then less than 10 years old, he may well have had a clearer recollection. But of course he did not do so, for the obvious reason that disclosure would have barred his entry.

Thus I cannot agree with the majority's view that the probative value of the facts admitted by Sprogis and assumed by immigration officials as the basis for their opinions is "slight." (Maj.Op. 123). However, I am forced by the district judge's assessment of credibility and the high proof standards required of the government by *Fedorenko, supra,* to concur in our holding that the judgment of the district court must be affirmed.