**In the Matter of Kwadwo OFOSU, Petitioner,**

**v.**

**Edward McELROY, Acting District Director of the New York District of the Immigration and Naturalization Service, Respondent.**

No. 94 Civ. 8103 (NG) (SS).

United States District Court,
S.D. New York.

Dec. 7, 1995.

Bradford H. Sewell, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for petitioner.

F. James Loprest, Jr., Special Assistant United States Attorney, Southern District of New York, New York City, for respondent.

*AMENDED ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION*

SOTOMAYOR, District Judge.

Kwadwo Ofosu ("Ofosu" or "petitioner"), a citizen of Ghana, petitions this court for a writ of habeas corpus seeking review of a Board of Immigration Appeals ("BIA") final order of July 25, 1994. The BIA denied petitioner's application for asylum made pursuant to 8 U.S.C. § 1158 and the withholding of return made pursuant to 8 U.S.C. § 1253(h), denied petitioner's motion to reopen the exclusion proceedings, and ordered exclusion from the United States under 8 U.S.C. §§ 1226 and 1227. Ofosu concedes excludability, but challenges the denial of his request for asylum and the withholding of return.

This petition was referred to Magistrate Judge Nina Gershon, who filed a Report and Recommendation (the "Report") on December 7, 1995, recommending that the petition for habeas corpus be denied. The Report found that there was substantial evidence in the form of Ofosu's own admissions that he had participated in the persecution of others and was thus ineligible for asylum or withholding.

Ofosu has made timely objections to the Report pursuant to 28 U.S.C. § 2254. Therefore, my standard of review is de novo. 8 U.S.C. § 1105a(a)(5).

## BACKGROUND

Ofosu claims he fled from Ghana because of his fear of persecution on account of his political opinion. Ofosu worked for eight years as a senior officer of the Committee for the Defense of the Revolution ("CDR"), a quasi-police force whose function, among others, Ofosu described as follows: "When you do something against the government. We—we usually go in with force." R. at 205.[1] In 1992, Ofosu became disillusioned with the regime then in power and the CDR's repressive activities, and decided to violate orders from the government to arrest certain political protestors. He left Ghana shortly thereafter. At the exclusion hearing held July 26, 1993, the Immigration Judge ("IJ") determined there was insufficient evidence to show Ofosu had a well-founded fear of persecution and that even if he had, his acts as an officer of the CDR were such that as a matter of discretion, asylum should not be granted. R. at 189–190.

On appeal, the BIA affirmed the IJ's decision, but on different grounds. Because Ofosu had assisted in the persecution of persons based on their political opinions, the BIA determined he was not qualified for refugee status under the persecutor exception, and therefore, was barred from seeking asylum or the withholding of return. R. at 5. The

persecutor exception states that the granting of asylum and the withholding of deportation is not available to any person who has "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(B); 8 U.S.C. § 1253(h)(2)(A).

Ofosu raises two objections to the Report. He claims that "there is no substantial evidence that [petitioner] *personally and actively* assisted in any political persecution." Petitioner's Objections to the Magistrate Judge's Report and Recommendations ("Pet.'s Objections") at 2 (emphasis in original). He also charges the Report erred by applying an incorrect legal standard for establishing culpability under the persecutor exception. Pet.'s Objections at 18–20. Having reviewed the record, I find no error with the Report's factual findings or its legal conclusions and adopt it in its entirety.[2]

## DISCUSSION

■ Judicial review of a BIA determination is very limited. BIA findings of fact are considered conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). A decision may be reversed only if the evidence presented to the BIA was "so compelling that no reasonable factfinder could fail to find [for the petitioner]." *INS v. Elias–Zacarias*, 502 U.S. 478, 484, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

■ The question of Ofosu's participation in persecution is a factual determination to be made by the BIA. 8 C.F.R. §§ 3.1(b) and 208.18(c). "The BIA's factual findings concerning eligibility for asylum and withholding of deportation must be upheld if supported by substantial evidence." *Sotelo–Aquije v. Slattery*, 17 F.3d 33, 35 (2d Cir.1994) (citing *Sofyan Ali Saleh v. INS*, 962 F.2d 234, 238

---

1. "R" refers to the certified record.

2. Ofosu filed a motion to reopen the initial hearing, seeking to introduce into evidence a Ghanian warrant for his arrest as proof of his fear of persecution. The BIA denied the motion because the warrant was available at the time the

hearing was held. Like the Magistrate, I determine that I need not reach this issue, since the warrant was offered as evidence of Ofosu's fear of persecution, an argument that is obviated by a finding that Ofosu was himself a persecutor.

(2d Cir.1992)). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)).

■ Here, the BIA's determination is amply supported by the record. Ofosu's testimony corroborates the BIA determination that he, at a minimum, "assisted or otherwise participated in political persecution." The following extracts from the record suffice to meet this threshold.

Q. How often did you accompany people to make arrests or go to make arrests yourself, with others?

A. I have made so many arrest, I cannot give you the number. That's why I'm scared of my life, because now I—that I am an enemy of the general public because of the arrest that I've made.

\* \* \* \* \* \*

Q. All right. Now you said that sometimes those prisoners were killed? Isn't that correct?

A. I said I think that—I'd—I've never seen anybody being killed, apart from those who were sent to face the firing squad. So since they were not allowed visitors in there, nobody knew what happened to them. We think, or I think they have been killed.

\* \* \* \* \* \*

Q. All right. Now as far as you know, were people arrested by the CDR, and held the CT—CDR ever tortured?

A. Yes. Most of them were tortured. Because we saw one torture you that, uh, you would never think of, uh, doing any-

thing against the government, if you were released.

R. at 231–233.[3]

The Report finds, and I agree, that the statute barring persecutors does not merely bar the trigger-pullers and torturers. The machinery of persecution requires as its foot soldier the arresting officer, and so long as that officer knows the likely consequences of his actions, he cannot find sanctuary in the United States under color of its protections for the persecuted. Arrest of persons the petitioner believed would be killed or tortured (or merely imprisoned indefinitely without trial) on account of their political actions constitutes persecution of the kind Congress considered sufficiently abhorrent to disqualify an applicant for refugee status. The petitioner, after some years of employment as a persecutor, now abjures that career choice. However commendable his conversion, Congress did not enact an exception to the statute at issue which absolves a persecutor of his past on account of a belated crisis of conscience.

## CONCLUSION

For the reasons stated above, the Magistrate Judge's Report is accepted and adopted in its entirety and the petition for writ of habeas corpus is **DENIED.** The Clerk of the Court is directed to dismiss the petition.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

GERSHON, United States Magistrate Judge:

Kwadwo Ofosu, a Ghanian, arrived in the United States on March 6, 1992 carrying a falsified Nigerian passport which contained his picture and another person's name. Certified Administrative Record ("R") p. 238. He was charged with excludability under 8 U.S.C. §§ 1182(a)(6)(C), 1182(a)(7)(A)(i)(I), 1182(a)(7)(B)(i)(I), and 1182(a)(7)(B)(i)(II).[1]

---

**3.** Petitioner claims his "admittedly distasteful activities" were limited to "[p]olitical surveillance and non-violent suppression of certain public free speech." Pet.'s Mem. at 21. Yet prior to his change of heart, Ofosu acknowledged arresting political dissidents when "I knew that some of the people that were to arrest would be killed by all means, if they were sent be—if they were arrested." R. at 218. At another point, Ofosu

acknowledged political opponents of the regime arrested by the CDR were sometimes imprisoned without trial indefinitely. R. at 229.

**1.** The difference between an exclusion proceeding and a deportation proceeding is as follows:

Aliens residing illegally in the United States are subject to deportation after a formal hear-

In this petition for a writ of habeas corpus, Ofosu seeks review of a July 25, 1994 final order of the Board of Immigration Appeals ("BIA") denying his application for asylum under 8 U.S.C. § 1158 and for withholding of return under 8 U.S.C. § 1253(h), denying his motion to reopen the exclusion proceedings, and ordering his exclusion from the United States.

Ofosu has conceded excludability. What he challenges is the denial of his request for asylum or for withholding of return.

### The Hearing.

The sole testimony at the hearing, held July 26, 1993, on Ofosu's excludability and on his request for asylum or the withholding of return was that of Ofosu himself. Ofosu testified that, prior to leaving Ghana, he worked for the government as a member of the Committee for Defense of the Revolution ("CDR"). Because he had disobeyed a CDR order to arrest political protestors at a rally, he believed he would be arrested upon his return to Ghana. Ofosu testified that the CDR was established by "Rawlings," (misspelled in the transcript as "Rollins") to work "alongside the police.",[2] R. 204. Ofosu became a member of the CDR in 1984 and, after a six month training period, he worked full time and was paid. R. 205–07.

As a member of the CDR, "spying" was something he did on a regular basis, even after working hours. "If I see something that was not, uh, that was against the government, I had to act. So it looks like I was always on duty." R. 207. Ofosu was a sen-

ior officer in the CDR and had "extra responsibility." R. 226. One of Ofosu's duties was to inform the government about people who spoke against Rawlings or sought to form political parties. Anyone who spoke against Rawlings was considered a criminal. R. 228. Most people arrested by the CDR were not charged with any crime. R. 211.

Ofosu never made any arrests alone. He reported what he saw and then, as a senior officer, he would accompany other CDR members and, as a group, they would make the arrests. R. 207, 230–31. When asked to describe the difference between the police and members of the CDR, Ofosu explained that the police were responsible for criminal cases, and the duties of the CDR "were only something that concerns the government. When you do something against the government. We-we usually go in with force." R. 205. By "go in with force" he meant that, in contrast with the police, who had to have warrants showing their authority to make an arrest and who could be questioned by the people being arrested, members of the CDR made arrests without warrants and answered no questions. R. 229–30. Because of this, "people were not scared of the police as they were scared us [sic]." R. 229. He testified that "in the beginning, we were not after political opponents we were after smugglers and other—but later on, when, uh, it turn [sic] out that we were sent to arrest people opposed to [the government], that's when I started not to like what I was doing." R. 234.

ing. Aliens arriving at the border, or those who are temporarily paroled into the country, are subject to an exclusion hearing, the less formal process by which they, too, may eventually be removed from the United States. In either a deportation or exclusion proceeding the alien may seek asylum as a political refugee for whom removal to a particular country may threaten his life or freedom.

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 159, 113 S.Ct. 2549, 2552–53, 125 L.Ed.2d 128 (1993) (footnotes omitted). Aliens found to be either excludable or deportable are subject to the physical act referred to as "deportation." *Id.* at 159 n. 5, 113 S.Ct. at 2552 n. 5.

**2.** According to the advisory opinion of the U.S. Department of State, dated June 24, 1993, included as part of the administrative record,

Flight Lieutenant Jerry Rawlings seized power from an elected government in Ghana on December 31, 1981 and suspended the constitution. R. 47. He continued to rule in Ghana although, in recent years, the country "has been in the process of a transition to constitutional rule." *Id.* In 1992, a new constitution was approved and a presidential election was held in which Rawlings was elected president with 58% of the vote. *Id.* The State Department noted that, with the imposition of democratic rule, "the opposition press remains vigorous and unrestrained by the government" and "the human rights situation has improved significantly." R. 48. Given the changed circumstances, the Department of State advised the Immigration Judge that Ofosu would not "be subjected to particular attention or abuse should he now return to Ghana." *Id.*

Ofosu's testimony established that the terms of detention for political dissidents were often severe. He testified that, "when a club or political party is not in an advanced state, when members were arrested, they were put in custody for about two months ... But when the political party or a club in an advanced state [sic], members were arrested indefinitely." R. 229. Ofosu never questioned the people he arrested, but simply turned them over to senior CDR officers or to soldiers. R. 232. Although some members of the CDR were given weapons, he was not selected to carry a weapon. With regard to the number of arrests Ofosu made, he testified:

> I have made so many arrest, I cannot give you the number. That's why I'm scared of my life [sic], because now I—that I am [an] enemy to the general public because of the arrest[ ] that I've made, I'm now [an] enemy to the government because of the way I arrest—I deserted the government. Now I don't have a stand. People, the people from the general public don't like me, the government doesn't like me.

R. 231.

Other than one person, who received a trial and whom he saw shot by a firing squad, Ofosu never saw anyone killed, but he thought that some of those arrested had been killed. R. 232–33. He also testified that he had never seen anyone being tortured, but most of the people arrested by the CDR were tortured, and he had seen one person after that person had been tortured. R. 233.

On the morning of February 17, 1992, Ofosu was ordered by a superior to make arrests at a rally to be held that day by members of the Ghanian Democratic Union ("GDU"), a political group that opposed the government. R. 214. Ofosu testified that, while he had never attended any meetings of the GDU, he "liked them because, uh, by that time there was nobody in Ghana that speak [sic] against [Rawlings]." R. 215. As approximately thirty-five CDR members set off to the rally, Ofosu tried to convince some of the officers that they should not make arrests:

> [O]n the way going, I started convincing them that I did not see why those people should be arrested because they have done

nothing, and what they were saying was the truth. So why are we—after we go the rally, we did not know what to do. Because though we had a position among us, nobody knew what to do.

R. 216. Ofosu spoke to seven officers who, in turn, spoke with other officers. When they arrived at the rally, instead of making arrests, they stopped the rally. R. 217.

This was not the first time he had been called upon to make arrests at a rally or demonstration; it was part of his job. R. 217–18. The reason he encouraged people not to make arrests at the February 17th demonstration was that, "I knew I was aware that some of the people that were to arrest [sic] would be killed by all means" if they were arrested. R. 218. Ofosu testified that this was not the first time he had failed to make arrests when ordered to do so: "[S]ometimes when we are asked to go and make arrests, we would go, but, uh, would not make any arrest and then we come back and report maybe we didn't find the place. This is the first time that, uh, I did it openly." R. 218.

In the week following the incident, Ofosu and the other CDR officers continued to go to work, but were questioned by the CDR about the incident. R. 236. On the morning of February 25, 1992, when Ofosu was on his way to work, a soldier told him that two of his colleagues in the CDR had been arrested by the army and that Ofosu was also to be arrested. R. 219. Ofosu left the country the same day. He testified that he had since learned that the two CDR officers who were arrested remain incarcerated without trial and are not allowed visitors and that members of the CDR were sent to his grandmother's wake in April of 1993 to look for him. R. 219–21.

Other than the CDR, he had not participated in any political groups in Ghana. R. 209. He felt threatened by a return to Ghana because Rawlings "uses the tactics of war" and "[s]ome of my colleagues are still arresting people without trial underground. And since these are ways that I know the tricks they used." R. 209.

*The Administrative Decisions.*

Following the hearing, the Immigration Judge ("IJ") issued an oral ruling finding that Ofosu was excludable on all charges and denying his request for asylum and withholding of return. R. 184–91. The IJ found that there was insufficient evidence to show that Ofosu had a well-founded fear of persecution and that, even if he had, asylum would be denied in the exercise of discretion, in light of Ofosu's own conduct as an officer of the CDR.

On appeal, the Board of Immigration Appeals ("BIA") affirmed the IJ's determination to deny relief, but on different grounds. The BIA found that Ofosu was ineligible for asylum or withholding of return because, as an officer in the CDR, he had assisted in the persecution of others:

> We find that the applicant's activities as an officer in the CDR disqualify him as a refugee because he has assisted in the persecution of others. *See Matter of McMullen,* 19 I & N Dec. 811 (BIA 1988), *aff'd on other grounds, McMullen v. INS,* 788 F.2d 591 (9th Cir.1986); *Matter of Rodriguez–Manjano,* 19 I & N Dec. 811 (BIA 1988). As indicated above, the applicant admitted that he arrested individuals on the basis of their political opinion. These individuals were subsequently imprisoned indefinitely, tortured, and in some instances killed. The applicant is barred from consideration as a refugee for asylum purposes and also disqualified from receiving withholding of deportation relief. *See* section 243(h)(2) of the Act, 8 U.S.C. § 1253(h)(2).

R. 5.

Ofosu sought to reopen the proceeding to introduce a warrant for his arrest which he said had been issued by the Ghanian govern-ment. The BIA denied the motion on the basis of regulations which require that new evidence must have been unavailable at the prior proceeding and that require foreign documents to be certified:

> We find [Ofosu's] explanation [that he did not present the warrant at his hearing because of ignorance and fear] implausible noting in the first instance its relevance to the applicant's asylum claim. We also consider that the applicant was represented by counsel during the proceedings and any questions regarding the document could have been addressed to counsel. Additionally, we have no information regarding the source of the reliability of the documents. We will not order reopening under these circumstances.

R. 6.

## DISCUSSION

An alien who, like Ofosu, is otherwise excludable from the United States, may remain in the United States if he can show that he is eligible either for asylum, under 8 U.S.C. § 1158(a), or for a withholding of return, under 8 U.S.C. § 1253(h)(1).[3] An alien seeking relief under either section bears the burden of proving eligibility. 8 C.F.R. §§ 208.13(a), 208.16(b). *See Saleh v. United States Dep't of Justice,* 962 F.2d 234, 238, 240 (2d Cir.1992).

The scope of judicial review of a BIA determination is "exceedingly narrow." *Carranza–Hernandez v. I.N.S.,* 12 F.3d 4, 7 (2d Cir.1993). The BIA's findings of fact are reviewed under the "substantial evidence" test and are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4).[4] The BIA's conclu-

---

3. An alien subject to an exclusion proceeding seeks what is called a "withholding of return," while an alien subject to deportation seeks "withholding of deportation." 8 U.S.C. § 1253(h)(1) applies to both.

4. Ofosu's argument that the BIA's determination must be supported by clear and convincing evidence is without merit. The clear and convincing evidence standard applies to the Government's burden of proof in a deportation proceeding. *See Woodby v. INS,* 385 U.S. 276,

286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966); *Laipenieks v. INS,* 750 F.2d 1427, 1429 (9th Cir. 1985). However, this case involves exclusion rather than deportation; in an exclusion proceeding it is the alien who bears the burden of proof. *See* 8 U.S.C. § 1361; *Landon v. Plasencia,* 459 U.S. 21, 35, 103 S.Ct. 321, 330–31, 74 L.Ed.2d 21 (1982). In any event, as noted in the text, an excludable alien has the burden of proving eligibility for asylum or the withholding of return. Certainly, if Ofosu bears the burden of proof, it cannot be, as Ofosu argues, that the

sions of law are reviewed *de novo. Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990).

Both the asylum and the withholding of return provisions, enacted as part of the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102, exclude aliens who have engaged in persecution. Section 1158(a) provides that asylum may be granted "in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee." Section 1101(a)(42)(A) defines a refugee as an alien who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." However,

> [t]he term "refugee" does not include any person who ordered, incited, assisted or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(B). In identical exclusionary language, Section 1253(h)(2)(A) states that an alien is ineligible for withholding of return if the alien "ordered, incited, assisted or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."

Applying these exclusionary provisions, the BIA concluded that Ofosu had "assisted" in the "persecution" of others "on account of ... political opinion." Ofosu challenges the BIA's determination; he argues that the BIA applied an overly broad interpretation of the statutes, 8 U.S.C. §§ 1101(a)(42)(B) and 1253(h)(2)(A), which bar those who have assisted in persecuting others, and that the evidence does not support the finding that he assisted in the persecution of others.

The statutory language used by Congress to exclude an alien from asylum or withholding of return if the alien assisted in the persecution of others is similar to the language used in prior United States immigration statutes barring Nazis who engaged in persecution from entering the country. *See generally Laipenieks*, 750 F.2d 1427, 1430–32

(9th Cir.1985) (reviewing history of prior statutes using similar exclusionary language). "Although [the Refugee Act of 1980] retained the 'ordered, incited, assisted, or otherwise participated in ... persecution' language [of prior United States statutes], it eliminated the references to Nazi Germany, thus expanding the universe of such undesirables. 8 U.S.C. § 1253(h)(2)(A)." *McMullen v. I.N.S.*, 788 F.2d 591, 598 n. 2 (9th Cir.1986).

A review of cases applying earlier immigration statutes which excluded Nazi persecutors confirms the correctness of the BIA's conclusion that Ofosu's conduct bars him from asylum or withholding of return. The Supreme Court, in *Fedorenko v. United States*, 449 U.S. 490, 512–13 n. 34, 101 S.Ct. 737, 750–51 n. 34, 66 L.Ed.2d 686 (1981), provided contrasting examples of conduct which would and would not constitute "persecution" under the Displaced Persons Act of 1948, Pub.L. No. 80–774, 62 Stat. 1009:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

The Court of Appeals for the Second Circuit noted in *United States v. Sprogis*, 763 F.2d 115, 122 (2d Cir.1985) (citations omitted):

> The clearest cases of assistance in persecution have been those in which an individual, often while employed at a concentration camp, has personally arrested or fired on detained civilians, or has ordered others to do so. In other cases, courts have characterized less hostile conduct as assistance in persecution, but in each of those cases, the individual condemned as a per-

---

Government must prove the contrary by clear      and convincing evidence.

secutor had actively participated in some act of oppression directed against persecuted civilians.

In *United States v. Dercacz,* 530 F.Supp. 1348, 1351 (E.D.N.Y.1982), for example, a former Ukrainian policeman who patrolled the streets, detained Jews who violated Nazi regulations and reported those who assisted the Jews was found to have assisted in persecution. Similarly, in *United States v. Osidach,* 513 F.Supp. 51, 96–99 (E.D.Pa.1981), a former policeman who acted as an interpreter when the Nazis interrogated detained Jews and who patrolled the streets of a Jewish ghetto, enforcing the Nazis' oppressive laws, was found to have assisted in persecution.

Ofosu's reliance on *Sprogis,* where assistance in persecution was not found, is misplaced, for Sprogis had merely "passively accommodated the Nazis, while performing occasional ministerial tasks which his office demanded . . . ." 763 F.2d at 122. Although he was a police officer, he had not "made any decision to single out any person for arrest and persecution [or] committed any hostile act against any persecuted civilian." *Id.* Ofosu, unlike Sprogis, *did* make decisions singling out individuals for arrest based upon their political opinions, and he effectuated, and even supervised the effectuation of, arrests, with full knowledge that the arrests would be followed by detention without any process, physical abuse and possibly even death.

Ofosu's activity closely resembles the conduct of the Ukrainian police officer in *United States v. Dercacz.* There, the Court upheld the revocation of citizenship of Michael Dercacz, finding that the "defendant, by virtue of his admitted duties, assisted the Nazis in persecuting civilian Jews." *Dercacz,* 530 F.Supp. at 1351. Dercacz testified that his duties included detaining Jews not wearing the required armband, identifying civilians selling food to ghettoized Jews and reporting to the commandant and the Gestapo. *Id.* Similarly, by his own testimony, Ofosu's duties involved reporting anti-government activity, arresting political dissidents and delivering them to the Ghanian Army where they would suffer indefinite detention, or torture.

Ofosu's claim that he cannot be excluded because there is no evidence that he "personally and actively" participated or assisted in persecution is without merit. *Cf. Laipenieks,* 750 F.2d at 1431–32. The undisputed evidence compellingly establishes not only that the CDR engaged in political persecution but that Ofosu's role in assisting in that persecution was active, personal and knowing. Ofosu worked full-time for the CDR from 1984 to 1992. As he put it, since "spying" was something he did on a regular basis and, if he saw something against the government, he had to act, he was "always on duty." R. 207. That some of the arrests which he made were non-political and for crimes such as smuggling, is of no moment. Ofosu repeatedly testified that a central purpose of his work, and he was a senior officer, was to identify and arrest individuals because of their anti-government political opinions.[5]

Ofosu argues that the Court should impose, not the statutory language, but the language of international instruments to which the United States is a party; and he relies on the fact that the Refugee Act of 1980 had, as one of its principal purposes, "to bring United States refugee law into conformance with the 1967 United Nations Pro-

---

5. Ofosu offers, as a basis for reopening the hearing, an affidavit "to clarify certain events and circumstances about which I testified at the immigration hearing." Affidavit of Kwadwo Ofosu Sworn to February 17, 1995 ¶ 1 ("Ofosu Afft."). In effect, he claims that, had he known that his testimony would be used to evaluate whether he himself had engaged in persecution, he would have testified differently. This argument is unworthy of further discussion.

In addition, Ofosu, who has been represented by counsel throughout these proceedings, now, for the first time, claims that the word "torture"

used by the interpreter at the hearing was inaccurate because he only meant to describe "abusive physical treatment of someone, such as a beating." Ofosu Afft. ¶ 12. This claim does not provide cause for reopening the proceedings. Even if the language he now proposes were substituted for "torture," his knowing assistance and participation in persecution of people because of their political opinions would be established. There is no statutory requirement that persecution involve "torture" rather than "abusive physical treatment of someone, such as a beating."

tocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 436–37, 107 S.Ct. 1207, 1216, 94 L.Ed.2d 434 (1987); *Garcia v. INS,* 7 F.3d 1320, 1324 (7th Cir.1993). However, as is clear from comparing the language of the statutes to that of the Convention, Congress did not conform our law by simply adopting all of the Convention's language. Although the first sentence of Section 1101(a)(42)(A), in using the language "persecution on account of race, religion, nationality, membership in a particular social group, or political opinion ..." is identical to the Convention, Congress did not adopt the language of the Convention in defining who should be excluded from refugee status. As the Joint Explanatory Statement of the Committee of Conference for the Refugee Act of 1980 states, the House Amendment, which was adopted, incorporated the Convention's definition of "refugee," as the Senate bill had done, but "specifically excluded from the definition persons who themselves have engaged in persecution." H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 19 (1980), *reprinted in* 1980 U.S.C.C.A.N 160, 160.[6]

Even if the language of the Convention were to be considered, Ofosu would not prevail. The Refugee Convention provides that a person is not a refugee under the Convention "if there are serious reasons for considering that (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes; ...." Convention Relating to the Status of Refugees, July 28, 1951, art. I(F)(a), 19 U.S.T 6259, 6263–64. The Charter of the International Military Tribunal, upon which Ofosu relies, includes in the definition of 'crimes against humanity,' *'persecutions on political, racial or religious grounds'* and states with regard to any such crimes that '[l]eaders, organizers, instigators, and accomplices participating in the formulation, execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan.'

*In re McMullen,* 19 I. & N. Dec. 90, 96 (BIA 1984) (citing Charter of the International Military Tribunal, Aug. 8, 1945, art. 6(c), 59 Stat. 1546, 1547) (emphasis added), *aff'd on other grounds sub nom., McMullen v. I.N.S.,* 788 F.2d 591 (9th Cir.1986).

Why Ofosu thinks that the Convention would not reach his conduct is not entirely clear. He seems to be claiming that his conduct was not sufficiently reprehensible, for he argues that "international norms define what acts are so abhorrent as to trigger the disqualifications" and that these are very narrow "as they must be in a world in which, however lamentable by American standards, governmental repression on account of political opinion is far more common and accepted." Petitioner's Memorandum of Law dated February 17, 1995, pp. 11–12. There is simply no support for the suggestion that, because persecution may be "common" or "accepted" in some places, Congress has not barred those engaged in it from relief under our immigration laws. As the BIA explained in *In re McMullen,* the statutory provisions at issue,

> by excluding from the definition of 'refugee' persons who have participated in the persecution of others, parallel and are consistent with the fundamental principles embodied in the United Nations 1951 Convention and 1967 Protocol Relating to the Status of Refugees. This exclusion from refugee status under the Act represents the view that those who have participated in the persecution of others are unworthy and not deserving of international protection.

*In re McMullen,* 19 I. & N. Dec. at 97 (footnotes omitted).

In sum, the language of the statutes, and the evidence, fully support the BIA's decision to exclude Ofosu. The language defining a refugee as one who fears "persecution" "on

---

**6.** This was not Congress's only variant from the Convention's definition of refugee. Congress also broadened the definition of refugee to allow the President to specify persons within their own countries to be treated as refugees. 28 U.S.C. § 1101(a)(42)(B); H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20 (1980), *reprinted in* 1980 U.S.C.C.A.N 160, 160.

account of race, religion, nationality, membership in a particular social group, or political opinion" is identical to the language which excludes from the definition of refugee one who himself engaged or assisted in "persecution" of anyone "on account of race, religion, nationality, membership in a particular social group or political opinion." Ofosu has shown no reason to treat the words of the exclusionary sentence in Section 1101(a)(42)(B) any differently from the words of the sentence defining refugee in that Section. *See INS v. Cardoza–Fonseca,* 480 U.S. at 431–32, 107 S.Ct. at 1212–13 (emphasizing the importance of the "ordinary and obvious meaning" of words used in the Refugee Act of 1980). Indeed, it is the very conduct which he asserts that he fears if he returns to Ghana which Ofosu argues did not constitute persecution when he worked as a senior officer of the CDR, namely, arrest without a warrant or charge, because of political opinions, resulting in indefinite detention, beatings or worse.

Finally, Ofosu argues that a balancing test should be applied to his conduct and that his years of work for the CDR should be balanced against, and found outweighed by, his refusal to obey an order to break up a demonstration by a democratic political organization. This argument has no basis in the statutes, which in no way suggest that someone who himself engaged in persecution is entitled to have his "good" conduct weighed against his "bad." On the contrary, since the very purpose of Section 1101(a)(42) is to exclude from refugee status persons who would otherwise be eligible for such status, imposing a balancing test would violate Congress's exclusion of those who have themselves persecuted others.

### CONCLUSION

The decision of the BIA was in conformity with the relevant statutes and was supported by substantial evidence. Therefore, the petition for a writ of habeas corpus should be denied.

Because the BIA upheld the IJ based upon its finding that Ofosu is ineligible for asylum or the withholding of return, there is no need to address the BIA's denial of Ofosu's motion to reopen the immigration hearing so that he could offer an arrest warrant; the warrant relates solely to the issue whether he has a well-founded fear of persecution, an issue which the BIA did not address.

Copies of this report are being mailed today to petitioner's and respondent's counsel who are hereby put on notice that any objections to this report must be made in conformity with 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thus, a party must serve and file, with a copy to me, specific written objections to the report within ten (10) days after being served with a copy of this report. A party that fails to file timely objections waives the right to further judicial review, including appellate review, of the decision. *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989). *See Thomas v. Arn,* 474 U.S. 140, 148–53, 106 S.Ct. 466, 471–74, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988). Any requests for extensions of time to file objections should be made to Judge Schwartz.

Dated: December 7, 1995